EL PUEBLO DE PUERTO RICO, demandante y peticionario, *v.* ADALBERTO ANDREU GONZÁLEZ Y OTROS, acusados y recurridos.

*Número:* O-76-83      *Resuelto:* 16 de noviembre de 1976

*Miriam Naveira de Rodón, Procuradora General, Candita R. de Orlandi, Procuradora General Auxiliar,* y *Maribel Pérez Mora,* abogada del Departamento de Justicia, abogadas del peticionario; *Justino Ferrer Muñoz,* abogado de la Corporación Ganadera del Este; *Julio C. Rivera* y *Luis Laguna Mimoso,* abogados de los acusados; Guillermo Nigaglioni y Raúl Torres, *pro se.*

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

█ El Ministerio Fiscal formuló acusaciones contra varias personas naturales y jurídicas por el delito de adulteración de leche[1]—Ley Núm. 234 de 23 de julio de 1974 (24 L.P.R.A. sec. 791)—ante el Tribunal Superior, Sala de Humacao. Dicho foro, en virtud de lo dispuesto en el Reglamento sobre Toma y Análisis de Muestras de Alimentos, Drogas y

---

[1] Respecto a la suficiencia de una acusación por este delito, véase *Pueblo* v. *Tribunal Superior,* 104 D.P.R. 209 (1975). El concepto "adulteración de leche" aquí utilizado es uno amplio que describe la situación en que se le añade directa y voluntariamente una sustancia extraña *no* permitida a la leche, o la situación en que debido al tratamiento o a la alimentación que ha recibido el ganado, al ser ordeñado, la leche contiene las substancias en cuestión. La responsabilidad absoluta que impone la ley en cualesquiera de estas circunstancias es de fácil comprensión.

Cosméticos—número 12—en vigor desde el 10 de febrero de 1945 (24 R.&R.P.R. sec. 730-1 *et seq.*), el Reglamento Sanitario Núm. 133, vigente desde el 6 de julio de 1970, (24 R.&R.P.R. sec. 790-301 *et seq.*), y el caso de *Pueblo* v. *Zalduondo Fontánez*, 89 D.P.R. 64, 71 (1963), acogió los planteamientos de los acusados y resolvió que el haber el Secretario de Salud tomado una sola muestra de leche para determinar la presencia de antibióticos, negaba a los acusados la oportunidad de tener su día en corte en igualdad de condiciones; en su consecuencia determinó la inadmisibilidad de los resultados de tales muestras. A solicitud del Estado, expedimos auto de *certiorari*, celebramos vista oral, habiendo quedado sometido el recurso para dictamen.

La teoría del tribunal de instancia, reiterada en alzada por los acusados, descansa básicamente en lo resuelto en *Pueblo* v. *Zalduondo*, supra, en que dijimos:

"Atendido el efecto evidenciario de las presunciones que establece la ley en relación con el resultado de los análisis de las muestras, y ante la posibilidad de la existencia de error en los exámenes, fácil es comprender que el propósito legislativo al incorporar el examen de la tercera muestra fue garantizar al ciudadano la oportunidad de comprobar la corrección de los resultados cuando existe discrepancia entre los efectuados. Para ello debe establecerse la existencia de la discrepancia entre el análisis oficial y el hecho privadamente por instrucciones del acusado ...." Pág. 71.

■ Primeramente, es menester aclarar que los pronunciamientos del caso de *Zalduondo* no son de estricta aplicación al de autos, ya que aquéllos deben entenderse en el contexto de la Ley de Vehículos y Tránsito allí interpretada en la cual el Legislador reconoció expresamente el derecho de un ciudadano a obtener una muestra adicional de sangre u orina para su análisis privado y una tercera muestra para análisis posterior por instrucciones del tribunal en caso de discrepancia, ello por razón de la *presunción concluyente*

sobre embriaguez alcohólica que la propia ley fija. (²) En casos de adulteración de la leche, ni por ley o reglamento se establece presunción alguna. El valor evidenciario del análisis de una muestra es el ordinario, a saber, establecer un hecho, que de no ser satisfactoriamente impugnado y merecerle crédito al tribunal, se torna entonces en prueba concluyente. *Pueblo* v. *Ruidíaz Pastrana*, 89 D.P.R. 284, 286 (1963).

En segundo lugar, aun en casos de análisis por alegada embriaguez en la conducción de un vehículo de motor como el de *Zalduondo*, supra, el Tribunal dejó entrever algunas circunstancias justificativas para prescindir del examen de comprobación, al señalar: "No hemos pasado por alto la posibilidad de que la tercera muestra que se conserva en el laboratorio del Departamento de Salud *se dañe o esté inservible, bien por el tiempo transcurrido desde que se tomó o por cualquier otro factor que corresponde a los químicos explicar.* Si así fuere este hecho puede probarse ante el tribunal y podría constituir una justificación razonable para que no se efectuara el examen de comprobación." Pág. 71. (Énfasis suplido.)

Aclarada la perspectiva del caso de *Zalduondo*, analicemos el que nos ocupa.

■ Conforme el historial explicativo y su contenido, (³) el Reglamento de Salud Núm. 12 del año 1944 que el tribunal

---

(²) Cabe destacar otras diferencias menos aparentes entre ambas situaciones. En el caso del conductor intoxicado, la presencia de alcohol en su cuerpo es pasajera y por condición inherente al estado de embriaguez no es posible exigirle que por sí realice gestiones conducentes a obtener muestras contemporáneas con su propio médico o químico, aparte del factor tiempo que ordinariamente transcurre en orden de los trámites investigativos de la policía y ante la autoridad judicial. En el caso de la leche, la fuente de la cual se toma la muestra se encuentra bajo el control del productor quien no está impedido ni restringido de hacer periódicamente los análisis de rigor necesarios para garantizar el cumplimiento de la ley y la pureza del alimento.

(³) En lo pertinente dispone:

a quo consideró rigurosamente aplicable, es uno que abarca los trámites relacionados con la toma de muestras, notificación al fabricante o vendedor del producto y el procedimiento del análisis e informe final del laboratorio. En lo que no estuviere en conflicto, estimamos que se extiende a toda otra reglamentación que contemple la gestión de tomar muestras alimenticias, entre las cuales está las relacionadas con la leche. En este sentido no podemos convenir con la tesis del Estado de que el Reglamento Núm. 133, por ser uno especial y posterior—que regula minuciosamente y con lujo de detalles los aspectos de la producción de la leche—derogó tácitamente las normas sobre toma de muestras en triplicado antes transcritas. Precisamente el Art. XXI del Reglamento 133 dispuso la abolición expresa de varios reglamentos y de ". . .

*"Sección 9*

"Las muestras oficiales se tomarán en triplicado cuando menos. Se podrá tomar un número mayor si fuere necesario, debiéndose entregar una de ellas al interesado y poniéndose las otras a disposición del Departamento de Salud para la investigación pertinente del caso. Las muestras informales, llamadas 'muestras de investigación' son para orientación del laboratorio correspondiente y constarán de una sola unidad, pero se recogerán en triplicado si posteriormente se ordena la toma de una muestra oficial.

*"Sección 10*

"Cuando del examen, análisis o investigación de una muestra oficial resultare que a juicio del Departamento existe adulteración, contaminación, falsa rotulación o en alguna forma el alimento o droga no sea propio para consumo público, se notificará al interesado, advirtiéndole de que si se deseare por este último la comprobación del examen, análisis o investigación en la muestra oficial en su poder, éste deberá ser hecho dentro del término que se establezca en el aviso de acuerdo con lo que se dispone más adelante.

*"Sección 11*

"En los casos por adulteración de leche, el examen de comprobación se llevará a efecto, de solicitarlo la parte interesada, dentro del término de 10 días a partir de la fecha de la notificación al interesado de que la muestra tomádale resultó adulterada; Disponiéndose que, en casos meritorios y si se alegaren razones satisfactorias ante nos, podremos extender dicho término por 5 días más; pero nunca se permitirán exámenes para comprobación de muestras de leche luego de transcurridos 15 días a contar desde la indicada notificación o si las muestras de leche se encontraren en estado de acidez incipiente . . . ." (24 R.&R.P.R. secs. 730-9, 730-10 y 730-11.)

todo Reglamento o parte de Reglamento que se oponga al presente. . . .", pero no derogó específicamente el Núm. 12. Debe pues entenderse, que ambos reglamentos subsisten en la medida en que no estuvieren en pugna o conflicto entre sí. Compárese: *González Saldaña* v. *Comisión Industrial*, 89 D.P.R. 267, 272 (1963).

Ahora bien, contrario a la posición de los acusados, el principio antes expuesto no significa que en todo caso tiene que seguirse mecánica e indefectiblemente los trámites de tomar tres muestras y que su omisión viola per se el debido proceso de ley. El derecho al debido proceso de ley no es un molde riguroso que se da en el abstracto, pues su naturaleza es eminentemente "circunstancial y pragmática". *Domínguez Talavera* v. *Tribunal Superior*, 102 D.P.R. 423, 428 (1974). Cada caso exige una evaluación concienzuda de las circunstancias envueltas, la naturaleza del alimento, la técnica utilizada, los factores químicos que afectan la muestra, su carácter perecedero, la urgencia de detectar si el alimento está o no adulterado, y el tipo de adulteración.[4] Ya en el pasado, en casos de adulteración de leche con agua, habíamos resuelto que no es impedimento para encauzar un caso criminalmente, el que a un acusado no se le hubiese entregado la muestra: *Pueblo* v. *Ramos*, 72 D.P.R. 833, 835 (1951) y *El Pueblo* v. *Pérez*, 23 D.P.R. 877, 880 (1916); como tampoco enerva el proceso el que no se hubiese hecho el examen de comprobación: *Pueblo* v. *Palacios*, 66 D.P.R. 961, 963 (1947).

En el caso de autos, el Estado ha alegado que la observancia del Reglamento Núm. 12 sobre muestras en triplicado es improcedente debido a la naturaleza perecedera

---

[4] Véanse: *United States* v. *Bel-Mar Laboratories, Inc.*, 284 F.Supp. 875, 877 (1968) y *United States* v. *Kendall Company*, 324 F.Supp. 628, 630 (1970), en los cuales respectivamente se resuelve qué cambios en las condiciones de una droga y la destrucción de las pastillas examinadas constituyen fundamento para relevar al gobierno de las muestras.

de la leche y estar tal trámite en conflicto con la metodología moderna utilizada para los análisis químicos de muestras, en particular para detectar sustancias antibióticas como la penicilina. Aduce que al añadirse a tales muestras preservativos, éstos actúan e interfieren con los resultados, [5] y por ende solamente se toman muestras en triplicado para aquellos análisis químicos por adulteración de leche con agua. De ser cierta esta alegación, ello sería motivo suficiente para no aplicarse el Reglamento Núm. 12, ya que estaría en conflicto con el Reglamento Núm. 133, con el criterio de razonabilidad y con el curso natural de lo físicamente posible. El debido proceso de ley ni el derecho coexisten para exigir cosas imposibles, [6] absurdas, [7] ni inútiles o innecesarias. [8]

Reconocemos que tal eventualidad, de ser correcta, pone a los acusados en una posición difícil en la defensa de sus intereses, pero ello no implica un estado de total indefensión. Como productores de un alimento tan básico, revestido de interés público, sobre ellos recae una gran responsabilidad, y en la conjugación de los intereses envueltos, la balanza necesariamente se ha de inclinar a garantizar la salud máxima del pueblo, la cual ". . . es ley suprema y debe protegerse por todos los medios que sean justos y procedentes." *El Pueblo* v. *Rodríguez*, 23 D.P.R. 424, 426 (1916). Nada les impide que periódicamente realicen los exámenes de rigor para asegurar la pureza de la leche; no vienen obligados a examinar el producto y a reaccionar únicamente cuando el Estado interviene. En esta balanza, es determinante el hecho—contrapuesto al poco perjuicio que emana de la leche adulterada por

---

[5] En la vista oral los abogados de los acusados apelados aceptaron tal posibilidad, argumentando que debería entonces notificárseles inmediatamente para ellos poder verificar la certeza del análisis observando su realización o contratando un químico particular.

[6] *Agostini* v. *Agostini*, 27 D.P.R. 516, 518 (1919).

[7] *Pueblo* v. *Galarza*, 41 D.P.R. 606, 614 (1931).

[8] *López, Alcalde* v. *Tribunal Superior*, 90 D.P.R. 304, 314 (1964); *Piereschi* v. *Comisionado Agricultura*, 62 D.P.R. 114, 120 (1943).

agua—que la presencia de residuos antibióticos en este alimento resulta extremadamente nociva a la salud debido a los efectos de inmunización a los antibióticos, las reacciones alérgicas y resistencia microbiana que ello puede producir sobre toda una población de niños y adultos consumidores. [9]

*Se dictará Sentencia revocando la Resolución del Tribunal Superior, Sala de Humacao de 15 de enero de 1976 y se devolverán los autos originales para la continuación de los procedimientos ulteriores compatibles con los términos de la presente.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Dávila no intervinieron. El Juez Asociado Señor Martín concurre en el resultado sin opinión.

---

[9] Goldberg, H., *Veterinary Medical and Nonmedical Use of Antibiotics,* Vol. 22, No. 1, Food Drug Cosm. L.J., págs. 33–40 (1967).