*In re* JAIME CALZADA LLANOS, querellado.

*Número:* O-83-348    *Resuelto:* 30 de junio de 1989

Roberto Schmidt Monge y Rafael Ortiz Carrión, Procuradores Generales, Américo Serra, Procurador General Interino, Miguel Pagán, Subprocurador General, y Rosa Negrón de Quiñones, Procuradora General Auxiliar, abogados de El Pueblo; Elí B. Arroyo y Eugenio Ramos Ortiz, abogados del querellado; Ángel F. Rossy García, Comisionado Especial.

EL JUEZ PRESIDENTE SEÑOR PONS NÚÑEZ emitió la opinión del Tribunal.

El Sr. Jaime Calzada Llanos fue nombrado y tomó posesión del cargo de Juez Municipal el 17 de marzo de 1980. Fue asignado como Juez Regular al Municipio de Naguabo donde se desempeñó hasta el 2 de noviembre de 1981, fecha en que fue asignado al Municipio de Fajardo. Se desempeñó como Juez Regular del Municipio de Fajardo hasta el 3 de mayo de 1983, cuando fue separado de esa posición.

El 3 de mayo de 1983, a raíz de un informe investigativo del Director Administrativo de los Tribunales, el entonces Juez Asociado Hiram Torres Rigual determinó la existencia de causa probable contra Calzada Llanos. Mediante resolución del mismo día, ordenamos al Procurador General a que formulara la correspondiente querella en su contra, a tenor con lo dispuesto en la Sec. 24 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, 4 L.P.R.A. sec. 232. En cumplimiento de dicha resolución, el 24 de mayo de 1983 el Procurador General formuló cinco (5) cargos contra Calzada Llanos.

En el primer cargo se le imputó al querellado conducta impropia al no rendir los informes correspondientes a los años 1981 y 1982 que indican sus actividades extrajudiciales, por las cuales recibió remuneración como resultado de la explotación de su negocio de vaquería y venta de leche para el consumo humano, todo ello en violación a lo dispuesto en los Cánones V y X de Ética Judicial, 4 L.P.R.A. Ap. IV-A.

En el segundo y tercer cargo se le imputó al querellado conducta impropia, inmoral e ilegal al ejercer funciones de administración, representación y/o manejo de los asuntos relacionados con una vaquería para la cual el Departamento de Salud del Estado Libre Asociado de Puerto Rico había expedido licencia de vaquería a favor del Sr. Augusto Márquez Alverio; al gestionar los servicios del notario Antonio Ríos Acosta, e instar al Sr. Luis R. Corcino Santiago a afirmar

bajo juramento ante dicho notario hechos que al querellado le constaban eran falsos, todo ello con el fin de obtener la expedición por el Secretario de Salud de una licencia de vaquería a favor del señor Corcino Santiago en violación a lo dispuesto en los Cánones I y VIII de Ética Judicial, 4 L.P.R.A. Ap. IV-A.

El cuarto y quinto cargo imputaron al querellado violaciones al Canon I de Ética Judicial, *supra*, al incurrir "en conducta inmoral, ilegal e impropia consistente en que desde el 19 de febrero hasta el 27 de marzo de 1983, en trece (13) ocasiones participó personalmente en el proceso de adulteración de leche cruda de vaca, para venderla con el fin de dedicarla al consumo humano" (Informe del Comisionado, pág. 2), y en defraudar a la Puerto Rico Dairy al entregarle leche adulterada en virtud de un contrato para la entrega de leche contraído con ésta. En relación con los actos imputados en estos dos (2) últimos cargos el querellado fue acusado criminalmente. Luego de ventilados los cargos en juicio plenario ante tribunal de derecho, el Tribunal Superior, Sala de Humacao, lo absolvió de todos los cargos que pesaban en su contra.

Oportunamente, el querellado contestó los cargos formulados por el Procurador General. En su contestación negó los hechos esenciales y alegó que, habiendo sido juzgado y absuelto previamente en el Tribunal Superior de Humacao por el delito de adulteración de leche y fraude en la entrega de cosa, existía impedimento colateral por sentencia en relación con los dos (2) últimos cargos imputados en la querella.

El 27 de junio de 1984 designamos al Juez Superior Hon. Ángel F. Rossy para que, en calidad de Comisionado Especial, oyera y recibiera la prueba que las partes tuvieran a bien presentar y la certificara al Tribunal con sus conclusiones de hecho. Celebrada la vista del caso y recibida amplia prueba testifical y documental, el 2 de junio de 1986 el Comisionado Especial certificó la misma acompañada de sus con-

clusiones de hecho. Notificadas las partes, el Procurador General compareció y expuso no tener objeciones al Informe del Comisionado Especial. El querellado Calzada Llanos compareció exponiendo varias objeciones al mismo. Las mismas no son persuasivas.

■   En su informe, el Comisionado Especial expuso conclusiones de hecho para cada cargo separadamente. Siguiendo dicha metodología, examinemos las conclusiones de hecho formuladas por el Comisionado Especial en cuanto a los cargos segundo, tercero, cuarto y quinto de la querella presentada.[1]

En cuanto al segundo cargo, el Comisionado Especial formuló, en lo pertinente, las conclusiones de hecho siguientes:

> . . . [P]ara el año 1981 el querellado era propietario y operaba dos vaquerías localizadas en el Barrio Mameyes I de Luquillo. Una era operada en terrenos de su propiedad y la segunda, denominada la Número Dos, en una finca colindante propiedad del Sr. Carlos Silva Torres.
>
> En el mes de agosto de 1981 el Sr. Augusto Márquez Alverio le expresó al querellado su interés en adquirir la vaquería Número Dos. Mientras se encontraban en el proceso de negociación el Sr. Márquez le expresó al querellado que no tenía dinero para adquirir la misma por lo que necesitaba tramitar un préstamo. Para facilitar y adelantar las gestiones de financiamiento el querellado traspasó su cuota de leche de esa vaque-

---

[1] Con relación al primer cargo, el Comisionado Especial concluyó que el querellado, mientras se desempeñó como Juez Municipal, cumplió con las disposiciones administrativas que les impone a los miembros de la Rama Judicial las leyes y reglamentos aplicables, así como con las obligaciones impuestas por la Oficina de Administración de los Tribunales. Concluyó, además, que el querellado no venía obligado a cumplimentar el informe anual requerido por el Canon X de Ética Judicial, 4 L.P.R.A. Ap. IV-A, puesto que la operación de sus negocios de vaquería no constituyen "'la realización de labores o servicios individuales prestados por el juez mediante compensación'" (Informe del Comisionado, pág. 17) a que se refería el citado canon. Analizada la prueba documental que tuvo ante sí el Comisionado Especial, coincidimos con la determinación hecha por éste en relación con el primer cargo, por lo que se exonera al querellado del mismo.

ría al Sr. Márquez Alverio a[u]n cuando la transacción no se había materializado.

Procedió así el Sr. Augusto Márquez Alverio a radicar una solicitud de licencia de vaquería ante el Departamento de Salud. También formalizó el 10 de noviembre de 1981 un contrato de entrega y recogido de producción de leche con la Suiza Dairy Corp. y radicó el 9 de noviembre de 1981 una solicitud de licencia en la Oficina de Reglamentación de la Industria Lechera para entregar su producción de leche a la Suiza Dairy. En esta solicitud consignó que su vaquería se encontraba localizada en el Barrio Mameyes, Kilómetro 32, Hectómetro 6, Municipio de Luquillo.

Conforme a lo convenido, la Suiza Dairy Corp. abrió un nuevo expediente para el Ganadero Augusto Márquez, recogiendo la producción de leche de su vaquería y librando a su nombre los cheques correspondientes en pago por la leche recibida. Entre el 7 de octubre de 1981 y el 30 de marzo de 1983 la Suiza Dairy expidió 77 cheques a favor de Augusto Márquez en pago por la leche recogida. De los cheques librados según antes indicado el Sr. Márquez endosó y cambió en el Colmado Rodríguez Carrasquillo el cheque núm. 509 expedido el 28 de octubre de 1981 y el núm. 1943 expedido el 13 de enero de 1982, habiéndose cambiado en efectivo sin endoso el cheque núm. 374. *Los restantes 74 cheques fueron endosados a favor del querellado Jaime Calzada Llanos, quien los depositaba en su cuenta en el Banco Popular de Puerto Rico.*

*Según testimonio aportado por el propio querellado, el Sr. Márquez Alverio no pagó suma alguna de dinero por la vaquería, por lo que nunca se consumó la transacción, habiendo retenido el querellado el control y todo derecho sobre la vaquería en forma ininterrumpida y como dueño administraba la vaquería, supervisaba personal, realizaba actos de dominio y recibía el pago por concepto de la leche que se producía y entregaba a la Suiza Dairy.*

A pesar de no haberse materializado la transacción, se consintió en que se expidieran las licencias solicitadas a favor del Sr. Augusto Márquez. El querellado tenía conciencia de que el Sr. Márquez ni era dueño, ni operaba la vaquería y no tomó medida correctiva alguna para que el Departamento de Salud y la Oficina de Reglamentación de la Industria Lechera conocieran esta realidad.

Este proceder y conducta está contemplado en el Reglamento Sanitario Núm. 133 de 18 de mayo de 1970, que reglamenta los aspectos sanitarios de la producción, distribución, manipulación, pasteurización, venta o donación de leche y productos de leche en Puerto Rico. Dicho Reglamento dispone en su Artículo II como sigue:

'Artículo II - *Licencias*

"Ninguna persona podrá producir, elaborar, envasar, almacenar, transportar, vender, exponer, ofrecer en venta o donar leche para consumo humano; o producir, elaborar o envasar producto de leche alguno para consumo humano si no está provisto de una licencia expedida por el Secretario previo el cumplimiento de los requisitos de este Reglamento.

*Las licencias son personales e intransferibles y s[ó]lo autorizan el negocio en el establecimiento para el cual se ha otorgado.* (Subrayado nuestro). . . .'"

Determinamos que le es imputable al querellado el conocimiento de las disposiciones del Reglamento Sanitario antes indicado, por lo que debió conocer que su proceder estaba reñido con las claras disposiciones del Reglamento y constituían violaciones al mismo.

Tratándose de un Reglamento revestido de tanto interés público por la finalidad perseguida —la preservación de la salud y bienestar del pueblo— su interpretación no puede ser tan liviana como para permitir como válida la excusa de la ausencia de mala f[e] e ignorancia de sus disposiciones para evadir así responsabilidades. Consideramos que el proceder del querellado es altamente censurable y se encuentra reñido con el C[a]non I de [É]tica Judicial.

Consignamos expresamente que la prueba aportada no demostró que la operación agrícola entorpeciera con el descargo adecuado de sus responsabilidades judiciales. Tampoco encontramos que la operación de una empresa agrícola, como resulta ser una vaquería, sea conflictiva per s[e] con lo preceptuado en el C[a]non VIII de Ética Judicial. (Énfasis suplido y escolios omitidos.) Informe del Comisionado, págs. 17–21.

En cuanto al tercer cargo, el Comisionado Especial determinó lo siguiente:

Para el mes de febrero de 1983 el querellado, Don Jaime Calzada Llanos, continuaba operando las dos vaquerías de su

propiedad bajo las circunstancias consignadas anteriormente. También se desempeñaba como Juez Municipal de Fajardo.

Según testimonio aportado por el querellado, para dicho mes y año el Sr. Luis R. Corcino Santiago, quien era su amigo personal y contable, expresó interés en comprarle las vaquerías. Para adelantar la transacción *autorizó al Sr. Luis R. Corcino a radicar una solicitud de licencia de vaquería bajo juramento, atestando falsamente que era dueño de su vaquería en el Barrio Fortuna de Luquillo* y que en dicha vaquería tenía 100 vacas lecheras en producción con un promedio diario de leche de 800 litros. Una vez juramentada y radicada por el Sr. Corcino la correspondiente solicitud, se expidió por el Departamento de Salud una nueva licencia a favor del Sr. Luis R. Corcino como dueño. La licencia expedida, la Núm. RF-2, correspondía a la expedida para una de las dos vaquerías propiedad del querellado y figuraba antes del traspaso como expedida a favor del Señor Augusto Márquez como dueño.

.    .    .    .    .    .    .    .

Determinamos que el Sr. Corcino con el propósito de adelantar sus gestiones para obtener financiamiento para adquirir la vaquería del querellado, libre y voluntariamente, suscribió bajo juramento la antedicha declaración utilizada para obtener una licencia a su nombre para operar la vaquería en cuestión, *con conocimiento que lo expresado era falso y para ello contó con la autorización del querellado. La realidad es que el querellado operó la vaquería de su propiedad como su único dueño desde el año 1980 y hasta que cesó sus operaciones en abril de 1983, sin contar con una licencia del Secretario de Salud a su nombre.*

*Conclu[i]mos que el proceder del querellado al participar y consentir a que se radicara la declaración jurada para fines oficiales con conocimiento de que lo allí atestado era falso,* constituye una conducta que viola el C[a]non I de [É]tica Judicial. Su proceder es altamente censurable por ser contrario a las claras disposiciones del Reglamento Sanitario Núm. 133 de 18 de mayo de 1970, que proh[í]be, expresamente, la operación de una vaquería sin una licencia válida del Departamento de Salud, las que son personales e intransferibles. (Énfasis suplido y escolios omitidos.) Informe del Comisionado, págs. 21–23.

Finalmente, en relación con los restantes dos (2) cargos imputados al querellado, el Comisionado Especial hizo, en lo pertinente, las conclusiones de hecho siguientes:

Por razón de que las plantas pasteurizadoras de leche venían confrontando problemas con la calidad de la leche que recibían de los productores, lo que les ocasionaba pérdidas cuantiosas, se convocó una reunión de los directores del Fondo para el Fomento de la Industria Lechera. Luego de discutirse el problema, los Directores convinieron en la conveniencia de contratar una firma independiente de investigadores privados, quien tendría la responsabilidad de realizar una investigación conducente a detectar los productores que entregaban leche adulterada a las plantas, así como identificar aquellos que intervenían en este proceso. Informe del Comisionado, pág. 23.

A tales efectos, el 8 de marzo de 1982 se suscribió un contrato con la compañía Security Associates International de Puerto Rico. Dicha compañía contrató posteriormente al Sr. José E. Muñoz Jiménez como investigador.

Una vez empleado el Sr. Muñoz, se le instruyó para que se personara a la Suiza Dairy y presentara una solicitud de empleo como conductor, lo que hizo. Allí fue entrevistado por el Sr. Miguel A. Maymi Rijos, Gerente de Operaciones, quien lo contrató como conductor de camión efectivo el 11 de noviembre de 1982 para recoger leche en las diferentes vaquerías.

Comenzó así a trabajar el Sr. Muñoz acompañado de otros conductores de la Compañía para aprender las diferentes rutas. . . . Luego fue asignado a la ruta de Luquillo, la que le fue mostrada por el Sr. Víctor Santiago. La ruta de Luquillo se sub-dividía en dos rutas, la A y la B. La A estaba compuesta por 12 ganaderos, entre ellos el Sr. Jaime Calzada.

.     .     .     .     .     .     .     .

Asignado como fue el Sr. Muñoz a la ruta de Luquillo, a partir del 19 de febrero de 1983, comenzó a recorrer la misma en compañía del chofer Víctor Santiago, quien lo acompañó el primer día. Luego la trabajó solo.

El día 19 de febrero de 1983, primer día que el Sr. Muñoz recorría la Ruta A en compañía del chofer Víctor Santiago se

visitaron todas las vaquerías comprendidas en dicha ruta, entre ellas las vaquerías que figuraban a nombre de los ganaderos Jaime Calzada Llanos y Augusto Márquez, ambas propiedad del querellado.

Al llegar a la vaquería del Sr. Jaime Calzada ese primer día, sábado 19 de febrero de 1983, estacionaron el camión y se desmontaron del mismo. Víctor Santiago se dirigió a donde se encontraba el Sr. Calzada y hablaron en privado. Luego ambos regresaron y Víctor Santiago le presentó al Sr. José A. Muñoz. *Inmediatamente bajaron las mangas del camión y el Sr. Santiago procedió a conectarlas a los tanques de leche de la vaquería en que se encontraba depositada la leche y a otro donde había depositada agua. Pasaron al camión 1,200 litros de agua a la cual se le habían agregado dos bolsas de un material blanco granoso y leche cruda que se encontraba en los tanques de las vaquerías de Calzada.* Como parte del arreglo en cada una de las vaquerías se dejaron 600 litros de leche que correspondía a la cantidad de 1,200 litros de agua con la solución dilu[i]da que fue agregada. *El Sr. Calzada le entregó al Sr. Santiago $120.00 en efectivo por recibir los 1,200 litros de agua. De éstos Santiago le entregó a Muñoz $60.00 reteniendo el balance.*

*Esta operación se repitió en las 13 ocasiones siguientes en que el Sr. Muñoz recogió la leche de las vaquerías del Sr. Calzada, variando únicamente el número de litros de agua que por instrucciones del Señor Calzada se preparaban.* Por cada 1,000 litros de agua se le echaban dos bolsas de 25 libras de un material blanco granoso. *Por recibir leche adulterada según antes indicado el Sr. Calzada le pagaba al Sr. Muñoz en efectivo y cheques.* El Sr. Calzada pagó en efectivo la suma de $120.00 el día 19 de febrero de 1983, cantidad que entregó al Sr. Víctor Santiago, de cuya cantidad el Sr. Santiago entregó la suma de $60.00 al Sr. Muñoz. El 21 de febrero de 1983 el Sr. Calzada entregó al Sr. Muñoz la suma de $100.00 por concepto de pago por el agua recibida en sustitución de la leche. El día 27 de febrero de 1983 el Sr. Calzada libró y le entregó al Sr. José Muñoz un cheque a su nombre por la suma de $200.00 en pago por el agua recibida en sustitución de la leche que se dejó en los tanques durante los días 23 y 27 de febrero de 1983. (Énfasis suplido.) Informe del Comisionado, págs. 24–26.

Así sucesivamente, el querellado fue entregando cantidades de dinero adicionales al señor Muñoz Jiménez como pago por el agua recibida en sustitución de la leche.

Tanto el dinero como los cheques recibidos fueron entregados por Muñoz al Sr. José Cabán, empleado de Security, persona que tenía a cargo su supervisión, y posteriormente, fueron entregados al Fiscal Eduardo De Jesús, quien intervino en la fase criminal del caso. El dinero fue posteriormente confiscado por orden del Tribunal Superior, Sala de Humacao, luego de lo cual fue remitido al Departamento de Hacienda.

El día 27 de marzo de 1983, último día en que el Sr. José Muñoz recogió leche en la vaquería del Sr. Jaime Calzada, éste se reportó a la Suiza Dairy como de costumbre. Una vez salió de la Compañía y conforme a las instrucciones que el Sr. José Cabán le había impartido, se detuvo en un negocio conocido como "Club Yaucano". Estando en el negocio se personó Cabán, acompañado de los Agentes Eugene R[í]os Santiago, adscrito a la Unidad de Inteligencia Criminal; el Agente Luis Daniel Erazo Félix, Supervisor de Inteligencia Criminal, Unidad de Operaciones de Campo; la mujer policía Amalia Abreu y un Inspector de Salud de nombre Héctor Rosado. También estaban presentes los fiscales que tenían a cargo la investigación. El Inspector de Salud procedió a inspeccionar el tanque termo del camión para cerciorarse que estuviera completamente vacío y luego le tomaron fotos. Antes de partir el Sr. Muñoz derramó un litro de leche sobre las mangas de recogido de leche del tanque. El Sr. Héctor Rosado había sido previamente asignado para tomar muestras de leche en la vaquería del Sr. Jaime Calzada para análisis químico y bacter[i]ológico. Los Agentes de la Policía bajo la supervisión del Agente Luis D. Erazo Félix tenían la responsabilidad de dar protección al inspector de salud para que pudiera realizar su trabajo.

Así salieron en ruta hacia Luquillo el Camión de la Suiza Dairy conducido por el Sr. José Muñoz y dos vehículos oficiales no rotulados. . . . Antes de iniciar la marcha habían convenido que los Agentes habrían de permanecer fuera de la vaquería hasta que el conductor José Muñoz les hiciera una señal previamente acordada que consistía en quitarse una go-

rra de pelotero que tenía puesta. En ese momento los agentes y el inspector de salud entrarían inmediatamente a la finca.

Al aproximarse a la entrada de la finca el Agente Ríos Santiago detuvo su vehículo y lo estacionó en un lugar retirado donde no tenía acceso visual a la finca. El vehículo que conducía el Agente Erazo Félix fue estacionado en la carretera, próximo a la entrada de la finca, donde abrieron el bonete del carro para simular que tenía desperfectos mecánicos. El Agente Erazo y la Oficial Abreu se bajaron del vehículo para poder observar la señal que desde el área de la vaquería les haría el Sr. José Muñoz. El Inspector Rosado permaneció en el carro con su equipo.

Una vez el Agente Erazo estacionó su vehículo, y siendo aproximadamente las 9:20 A.M., el camión de la Suiza Dairy conducido por el señor Muñoz entró a la finca. Al llegar a la vaquería estaban presentes el Sr. Jaime Calzada y el Sr. Carlos Cabrera, quien había llegado ese día en la mañana acompañando al Sr. Gabriel Centeno García, un mecánico de equipo de ordeño.

.    .    .    .    .    .    .

Una vez estacionado el camión de recogido de leche en presencia del Sr. Calzada y el Sr. Cabrera según antes indicado, el Sr. Calzada le indicó al conductor que siguiera "bregando" en lo que iba a su casa que estaba como a 300 pies de distancia para buscar un material. *En lo que el Sr. Calzada fue a su casa el Sr. Cabrera y el Sr. Muñoz cargaron agua de un tanque cont[i]guo al cuarto de depósito de leche. Luego comenzaron a cargar la leche de uno de los dos tanques que se encontraban en el cuarto de depósito de leche. En eso llegó el Sr. Jaime Calzada en su vehículo Toyota Célica, color rojo y lo estacionó frente al camión de leche, al lado del cuarto donde estaban los tanques de leche. Sacó entonces dos bolsas del baúl y las puso sobre el tanque. El Sr. Cabrera echó las dos bolsas en el tanque que habían vac[i]ado y le echaron agua.* Cabe aquí señalar que sometidos a análisis químico los res[i]duos en el interior de las bolsas según más adelante habremos de consignar, se determinó la presencia de cloruros y

glucosa en éstas.[(2)] El Sr. Muñoz le dijo entonces a Cabrera que lo batiera bien en lo que prendía las bombas para recogerla. Al salir afuera para prender la bomba del tanque se quitó la gorra de pelotero que tenía puesta, que era la señal convenida[(3)] y prendió la bomba del camión para recibir dicha substancia.

Inmediatamente el Agente Erazo Félix subió en su vehículo a la vaquería, tardando aproximadamente 30 segundos en llegar al lugar donde se encontraba el camión y el cuarto de depósito de leche. Al llegar el Agente se dirigió al cuarto de depósito de leche y ordenó que detuvieran el recogido de leche inmediatamente, lo que hicieron. El Inspector Rosado se dirigió hacia donde se encontraba el Sr. Jaime Calzada, quien estaba sentado dentro del vehículo Toyota Célica, color rojo, que estaba estacionado al lado del camión y le mostró su identificación del Departamento de Salud, indicándole que iba a tomar muestras de leche en la vaquería. El Agente Erazo también se le identificó como Policía. (Énfasis suplido y escolios omitidos.) Informe del Comisionado, págs. 27–31.

Los análisis químicos practicados a las muestras de leche tomadas en la vaquería del señor Calzada para determinar agua añadida dieron como resultado un 75.06% de agua añadida. Se concluyó que las muestras no reunían los requisitos mínimos de leche, siendo una solución no apta para el consumo humano.(4)

---

(2) Según la prueba pericial admitida en evidencia, estos químicos pueden ser usados para burlar el análisis conocido como "crioscopatía", utilizado para evaluar la calidad de la leche y para determinar si su composición natural ha sido adulterada.

(3) De la inspección ocular que llevó a cabo el Comisionado Especial, éste determinó que del sitio en que estaban estacionados los agentes se podía observar cualquier señal que pudiera haberse hecho desde el área donde se encontraba el camión.

(4) Determinó, además, el Comisionado Especial que en las cinco (5) ocasiones en que la Suiza Dairy recogió leche de la vaquería del querellado, en virtud de un contrato suscrito a esos fines, ésta tuvo que decomisar la misma dado el hecho de que los análisis químicos realizados por los técnicos de la compañía determinaron que dicha leche no era apta para el consumo humano por contener un volumen de agua sobre lo normal.

## I

Un examen detenido y minucioso de toda la prueba documental que tuvo ante sí el Comisionado Especial, así como de las constancias en autos, nos convence de que las conclusiones de hecho del Comisionado Especial están sustentadas por la evidencia presentada. Una apreciación integral de la misma refleja que el querellado incurrió en conducta lesiva a las normas éticas esenciales que regulan el proceder de todo magistrado en nuestra sociedad.

■ La evidencia presentada demuestra, en primer término, que el querellado durante un largo período de tiempo operó su negocio de vaquería y venta de leche para el consumo humano sin tener licencia para ello y a sabiendas de que dicha conducta estaba reñida con claras disposiciones de ley. Demostró, además, que el querellado consintió e hizo gestiones conducentes a que varias personas obtuvieran de manera fraudulenta y atestando hechos falsos varias licencias de vaquerías por parte del Departamento de Salud, todo ello para su propio beneficio. Al así actuar, el querellado incurrió en conducta altamente impropia y reprensible.

■ Por otra parte, la prueba también tendió a demostrar que el querellado participó activamente en el proceso de adulteración de leche de vaca con el fin de venderla para el consumo humano. Como es sabido, la práctica de adulterar leche ha sido severamente sancionada por este Tribunal a través de nuestra trayectoria jurisprudencial, pues la misma, además de reflejar conducta deshonesta, atenta contra la salud y el bienestar de los miembros de nuestra comunidad. Por tal razón, en estos casos se impone un tipo de responsabilidad absoluta. *Pueblo v. Delgado López*, 106 D.P.R. 441 (1977); *Pueblo v. Andreu González*, 105 D.P.R. 315 (1976); *Pueblo v. Tribunal Superior*, 104 D.P.R. 209 (1975); *Pueblo v. Solla*, 66 D.P.R. 957 (1947); *Pueblo v. Nieto*,

64 D.P.R. 882 (1945). Aunque en el caso que nos ocupa la prueba presentada sobre este particular resultó un tanto confusa y difícil de precisar en cuanto a ciertas actuaciones del querellado, una apreciación integral de la misma a la luz de todos los hechos y circunstancias involucradas refleja que el querellado Calzada Llanos no tan sólo participó directamente en dicho proceso, sino que personalmente pagó para que la misma fuera recogida y transportada de su vaquería a la compañía pasteurizadora. Siendo ello así, no existe motivo alguno para alterar las conclusiones del Comisionado Especial a ese respecto.

En cuanto a la defensa levantada por el querellado, a los efectos de que su absolución del delito de adulteración de leche y fraude en la entrega de cosas impide la presentación de la querella que nos ocupa, no le asiste la razón. Contrario a lo que alega éste, no existe en el caso de autos impedimento alguno para la formulación y dilucidación de la presente querella. En *In re Rodríguez Caraballo*, 106 D.P.R. 792, 799 (1978), expresamente indicamos que "[l]a absolución del querellado en la causa penal no impide que por los mismos hechos se juzgue su conducta a los fines de determinar si incurrió en alguna falta de ética". Véanse, además: *In re De Castro*, 100 D.P.R 184, 197 (1971); *In re Liceaga*, 82 D.P.R. 252, 255, 256 (1961); *In re Dávila*, 79 D.P.R. 816 (1957); *In re Abella*, 67 D.P.R. 229, 238 (1947); *In re González Blanes*, 65 D.P.R. 381, 391 (1945); *In re Tormes*, 30 D.P.R. 267, 271 (1922). Adviértase que en un procedimiento como el de autos —dirigido a determinar si se ha incurrido en alguna conducta reprensible o impropia— no es necesario probar los hechos de igual manera como si se tratase de un caso criminal. *In re De Castro*, supra.

En el presente caso, la prueba presentada demostró inequívocamente que el querellado incurrió en la con-

ducta antiética, reprensible e impropia de un magistrado que merece sanción disciplinaria a tenor con lo dispuesto en la Sec. 24 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, *supra*. Al incurrir en dicho comportamiento, el Juez Calzada Llanos no se mantuvo a la altura de la norma enunciada en el Canon I de Ética Judicial, *supra*, que dispone:

La fe de un pueblo en la justicia, como valor esencial de la democracia, debe ser mantenida por los tribunales a los más altos niveles de la responsabilidad pública.

En el ejercicio de su delicada función, aquellos llamados a impartir justicia, conscientes de la posición que ocupan en la sociedad y de la trascendencia de su misión, deben velar por que sus actuaciones respondan a normas de conducta que honren la integridad e independencia de su ministerio y estimulen el respeto y la confianza en la judicatura.

Contrario a lo exigido por el citado canon, el querellado actuó de forma incompatible con las normas de conducta que rigen su ministerio y el fiel descargo de la función judicial.

Ante esa situación, y en vista de que el querellado incurrió en la conducta inmoral, impropia y reprensible que así lo justifica (*In re Gallardo*, 81 D.P.R. 19 (1958)), se hace necesaria su destitución del cargo de Juez Municipal.

Por todo lo anterior, *se dictará sentencia que decrete la destitución del querellado Sr. Jaime Calzada Llanos del cargo de Juez Municipal.*

El Juez Asociado Señor Rebollo López no intervino.