VOTO CONCURRENTE DEL
JUEZ NEGRON SOTO
2001 DTA 46
San Juan, Puerto Rico, a 13 de noviembre de 2000
Estoy de acuerdo con todo lo expresado en la decisión mayoritaria emitida por este panel. No obstante, considero prudente hacer unas expresiones adicionales.
En este caso, la controversia planteada consiste en resolver si la difusión en año eleccionario sin contar con el permiso de la Comisión Estatal de Elecciones (C.E.E.) de un video de menos de dos minutos y medio de duración sobre la obra del Municipio de San Juan -donde aparece la figura de la Alcaldesa, Hon. Sila María Calderón, candidata a la gobernación por el Partido Popular Democrático, por breves momentos en una actividad privada celebrada exclusivamente con la presencia de empleados del Municipio con fines de adiestramiento-, viola el Artículo 8.001 de la Ley Electoral, 16 L.P.R.A. see. 3351, que prohíbe a las agencias de Gobierno, la Asamblea Legislativa, la Rama Judicial y los municipios utilizar dinero del erario público para exponer sus programas, proyectos, logros, proyecciones y planes de gobierno al público.
Consideramos que la prohibición de dicho Artículo no se extiende a la divulgación interna y privada de un video a empleados municipales, cuando el único propósito del mismo es el adiestramiento de éstos y lograr su motivación.
En el caso ante nos, no está en controversia el hecho de que el video se exhibió el día 13 de enero de 2000 en una actividad intema del Municipio de San Juan, en lo sucesivo Municipio, programada y celebrada con el único propósito de promover la motivación de los empleados municipales. Esta no era la primera vez que se celebraba este tipo de actividad. En el 1998, el Municipio de San Juan celebró, por primera vez, una actividad, de ese tipo, en la que se presentó un video similar al ante nos. En el 1999 se iba a celebrar una segunda actividad pero no pudo llevarse a cabo a consecuencia del paso del huracán Georges por la isla, por lo que se celebró la misma el 13 de enero de 2000. Esto revela un patrón de conducta encaminado solamente a cumplir con el plan gerencia! y de buena administración concerniente a los adiestramientos y motivaciones de los empleados.
Ciertamente, contrario a lo alegado por el representante del Partido Nuevo Progresista ante la Junta de Anuncios al solicitar una investigación, el Municipio no llevó a cabo una actividad "para celebrar el tercer aniversario de la toma de posesión de la alcaldesa de San Juan", ni ésta se programó para demostrar los logros de dicha funcionaría. Tampoco es correcto que el video, el cual vimos, divulgara información con ese propósito.
El Artículo 8.001 de la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada por la Ley Núm. 3 de 10 de enero de 1983,16 L.P.R.A. see. 3351, dispone que:

“Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición, aquellos avisos y anuncios de prensa expresamente requeridos por ley. ”

*803
Asimismo, se exceptúan de la anterior disposición, aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. ”

El Reglamento para el Control de Gastos de Difusión Pública del Gobierno, Elecciones Generales 2000 de la C.E E., aprobado el 10 de diciembre de 1999, se hace con el propósito de:
"... reglamentar la prohibición sobre los gastos para la compra de tiempo y espacio en los medios de difusión pública, así como de otros medios de difusión, según se define en el mismo, de las agencias del gobierno de Puerto Rico, la Asamblea Legislativa y la Rama Judicial, a partir del 1ro. de enero del año en que se celebren las elecciones generales y hasta el día siguiente a la fecha de celebración de la misma, a los fines de evitar la divulgación publicitaria que tenga el propósito de exponer programas, proyectos, logros, realizaciones, proyecciones o planes, lemas o expresiones proselitistas o frases procedentes de campañas políticas que en alguna forma coaccionen o afecten la voluntad de los electores. ”
Por otro lado, el gobierno tiene la responsabilidad de poner en conocimiento a los ciudadanos, diversos aspectos de interés público, de urgencia o emergencia, con el fin de que puedan proteger su bienestar, hacer valer los derechos y conocer sus responsabilidades. Bajo estas circunstancias, la divulgación de información sólo será permitida, previa autorización de la Comisión, en los casos pertinentes.
Este dispone en su Sección 4.1 que:

“Toda agencia que directa o indirectamente proyecte incurrir en gastos en el uso de cualquier medio de difusión para emitir cualquier información de urgencia o emergencia, tendrá que someter previamente una solicitud de autorización ante la Comisión, en original y cinco copias. ”

Además, la Sección 6.1 del Reglamento establece que:

“La autorización para que se incurra en gastos de difusión en el período comprendido entre el 1ro. de enero de 2000 y hasta el día siguiente al día. de las elecciones generales, constituye una excepción a la prohibición de la ley, por lo que recaerá sobre la agencia el peso de la prueba para demostrar que el gasto propuesto en la solicitud no se hace con el propósito de exponer programas, proyectos, logros, realizaciones, proyecciones o planes. ”

Además de las razones que deberán informarse en la solicitud, la Comisión o los Oficiales Examinadores podrán requerir la presentación de un escrito debidamente fundamentado, en apoyo de la procedencia de la información a ser difundida.
El historial legislativo de la Ley Electoral ni el Reglamento cubren la situación planteada ante nos, lo que revela que el legislador ni siquiera imaginó que la situación ante nos podría representar una violación a ese estatuto. La C.E.E. tampoco consideró dicha situación en su Reglamento y, de hecho, no la incluyó en sus adiestramientos sobre la Ley Electoral que le brindó al Municipio en diciembre de 1999.
Esto tampoco ha sido interpretado por el Tribunal Supremo de Puerto Rico al considerar el Artículo 8.001, ante, en su casuística, quien a pesar de exponer una interpretación amplia de la Ley Electoral, no ha extendido la prohibición del Artículo 8.001, ante, a la transmisión o utilización de medios de difusión pública en actividades intemas o privadas de los organismos públicos hechos con fines de adiestramiento y ausentes de motivación política. Véase: Miranda v. C.E.E., 96 J.T.S. 137 P.P.D. v. Rosselló, 95 J.T.S. 165 y 95 J.T.S. 165-A, y Romero Barceló v. Hernández Agosto, 115 D.P.R. 368 (1984).
Ciertamente, la situación fáctica ante nos, no puede estar cubierta por los estatutos antes citados. Los *804 desarrollos gerenciales y la comunicación entre los empleados ha cambiado en los últimos años. Desde tiempos inmemoriales se sabe que "si una empresa pudiera atraer y retener a sus empleados con motivaciones definidas, sus problemas serían mínimos." Antonio de la Luz, La Administración de los Recursos Humanos, Hato Rey, Puerto Rico, Ramallo Bros. Printing, Inc., 1982, pág. 251. A esos efectos, expresa de la Luz, ibid,:

“Un empresario puede ofrecer las mejores condiciones físicas, sociales y económicas a sus empleados, pero ello no garantiza el buen rendimiento de éstos. Se requieren tres ingredientes básicos: la motivación, la moral, y la consejería.

El concepto de motivación puede compararse con el mecanismo de una máquina. Si la máquina no funciona, tratamos enseguida de determinar las causas que impiden su funcionamiento. Este mismo concepto debe aplicarse a la conducta del trabajador. Cuando un empleado tiene un bajo nivel de rendimiento, comete errores, no usa eficientemente sus materiales y equipo, tiene un sinnúmero de ausencias, tardazas y accidentes, debe analizarse la situación para determinar qué factores y/o variables están afectando su trabajo.” (nota al calce nuestra).
La motivación de los empleados se logra a través de la satisfacción de sus necesidades y el estímulo para que estas personas logren sus metas, además de las de la compañía para la cual trabajan. Kathryn M. Bartol, Management, New York, McGraw-Hill, Inc. 1991, pág. 445. Para conseguir la motivación de los empleados, los estudiosos de la materia (Maslow, Aldefer, Herzberg, y McClelland), han articulado diferentes enfoques sobre el tema. De la Luz, ibid, págs. 255-257, y Kathryn M. Bartol, ibid., págs. 448-456. Algunos de los enfoques coinciden en cuáles son estas necesidades, aunque las llaman de diversas maneras. Estas, según el enfoque de Maslow, son las necesidades psicológicas, de seguridad, sociológicas de auto-realización y fisiológicas y su satisfacción se logra a través de ascensos, adiestramientos, premios por productividad, participación en comités, y el establecer un clima de trabajo donde las personas puedan desarrollarse plenamente, entre otras. Véase, De la Luz, ibid, págs. 255-257.
A tenor con ello, debemos mencionar que con los avances tecnológicos, las formas de comunicación han variado, éstas empezaron verbales, de persona a persona, o mediante reuniones, escritOs, utilizando métodos como los memorándums o los informes formales, teléfonos, cintas de grabación de audio, videos y ahora el correo electrónico y la internet, donde se puede divulgar información y hasta fotografías de los proyectos. Véase, K.M. Bartol, Management, ibid.
Nada de esto se encuentra contemplado en la Ley Electoral, la cual define, escuetamente, en su Artículo Núm. 1.003, 16 L.P.R.A. see. 3003 (24), el término medios de difusión como incluyendo los medios de "radio, cine, televisión, revistas y publicaciones periódicas". De otro lado, el Reglamento para el Control de Gastos de Difusión Pública del Gobierno se ha ido atemperando a los avances tecnológicos, e incluye en su sección 1.4 (8) una definición más amplia de lo que son los métodos de difusión publica, a saber: la radio, cine, television, periódicos, revistas, publicaciones periódicas, hojas sueltas, rótulos, símbolos, emblemas, fotografías, grabaciones, ya sean en cintas, discos, discos compactos u otras, internet y otro medio capaz de difundir, propagar y divulgar un mensaje, sea de forma directa o indirecta". No obstante, éste no prohíbe que dichos medios sean utilizados, ni exige que se tenga que pedir permiso para transmitir un video, el cual es claramente un método de difusión pública, con los propósitos de adiestrar a los empleados gubernamentales en una reunión privada a la que sólo éstos asistan.
Ante la ausencia de legislación e interpretación de la misma a los efectos de regular las actividades hechas con el propósito de adiestrar empleados públicos durante el año eleccionario, un hombre prudente y razonable no podía pensar que era ilegal transmitir sin el permiso de la C.E.E., en una actividad privada y con el único propósito de motivar a sus empleados municipales un video de menos de dos minutos y medio sobre el trabajo que se realizó en el Municipio antes de comenzar la veda electoral. Ello es así, pues la Ley Electoral y la jurisprudencia interpretativa de ésta sólo han considerado el evitar que se utilicen los recursos del erario público *805 para difundir los logros y el programa del gobierno al público en general. En fin, resulta obvio que esta legislación no puede tener el propósito de impedir la comunicación entre los empleados públicos y la administración gubernamental. Máxime cuando la violación de esta Ley . podría conllevar la comisión de un delito público penable, conforme a su Artículo 8.004 de la Ley Electoral, 16 L.P.R.A. see. 3354, el cual dispone que:

“Toda persona que, a sabiendas y fraudulentamente, obrare en contravención de cualesquiera de las disposiciones de este Subtítulo, o que teniendo una obligación impuesta por el mismo, voluntariamente dejare de cumplirla, o se negare a ello, será culpable de delito electoral y, de no proveerse en este Subtítulo, la imposición de una penalidad específica por tal violación, será sancionada con pena de reclusión que no excederá de seis (6) meses o multa que no excederá de quinientos (500) dólares, o ambas penas a discreción del tribunal. Diciembre 20, 1977, Núm. 4, p. 639, art. 8.004, ef. Diciembre 20, 1977. ”

Debemos recordar que las leyes penales hay que interpretarlas restrictivamente en cuanto desfavorecen al acusado y liberalmente en cuanto a lo que lo favorece. Pueblo v. Barreto Rohena, 99 J.T.S. 172, pág. 371; Pueblo v. Rodríguez Jiménez, 128 D.P.R. 114 (1991); Pueblo v. Arandes de Calis, 120 D.P.R. 530 (1988). Ello requiere que la persona tenga una efectiva notificación sobre lo que está O no incluido dentro de la prohibición. De no ser así, estaríamos ante un caso claro de incumplimiento con el debido proceso de ley. Pueblo v. Barreto Rohena, supra. Así, los tribunales no pueden declarar como delito conducta que esté excluida de una ley. Pueblo v. Barreto Rohena, supra. El razonamiento utilizado por el Tribunal de Primera Instancia en su Sentencia parcial, tácitamente advirtió de ese peligro.
Aunque con esto bastaría para determinar que la Ley ni los reglamentos consideraron que un video utilizado para difundirse como parte de un adiestramiento interno de un Municipio o de una agencia pública quedan cubiertos por el Artículo 8.001 de la Ley Electoral, ante, es menester mencionar que en los últimos años han ocurrido grandes cambios en las relaciones entre los empleados públicos y las entidades gubernamentales que conllevan brindarle una mayor atención y mantener una administración más alerta y eficiente a las relaciones de empleado y patrono.
El ejemplo más trascendental es el cambio significativo ocurrido en el servicio público al aprobarse la Ley Núm. 45 de 25 de febrero de 1998, conocida como la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico, 3 L.P.R.A. sees. 1451 et seq., que permitió a los empleados públicos organizarse y afiliarse a organizaciones sindicales. Dicha Ley trae como consecuencia una mayor necesidad de los administradores públicos de celebrar seminarios y actividades, como la del caso de marras, para ofrecerle adiestramiento y/o brindarle una motivación efectiva a los empleados; máxime cuando es obvio que ante estas circunstancias, los dirigentes de las organizaciones sindicales no pueden tener impedimentos para comunicarse con los empleados. ¿Pudo visualizar el legislador y la C.E.E. que por ser año eleccionario los dirigentes de las agencias públicas y los municipios en los cuales los jefes y alcaldes son candidatos a puestos electivos no pudieran comunicarse con sus empleados excepto de manera verbal? ¿Cómo esto altera el propósito de la Ley Electoral? ¿Debe la C.E.E. pasar juicio sobre las comunicaciones intemas de los distintos departamentos del Ejecutivo, municipios y la Legislatura para incluir esas necesidades generales básicas? Forzosamente, la contestación a todas estas interrogantes es que nada de eso fue contemplado y que la prohibición atentaría contra los más sanos principios gerenciales y de administración pública.
Nada de lo antes dicho es contrario a la norma jurisprudencial de que la Ley Electoral debe ser interpretada de manera amplia para que no se impida a la C.E.E. que mediante reglamentación regule y exija que se cumpla el propósito de la Ley Electoral. Decidir el caso de marras de forma contraria a la aquí expuesta, a nuestro juicio, no sólo estaría en desacuerdo con ese propósito de ley, sino que sería injusto y rallaría en lo absurdo. Bajo ninguna alternativa debemos poner en riesgo a los funcionarios públicos a quienes les aplica dicha Ley, ya que por cumplir con sus funciones ministeriales y de sana administración pública, pudieran estar expuestos a querellas en las agencias administrativas pertinentes, inclusive ante la Comisión Para Ventilar Querellas *806 Municipales, y hasta ser acusados y juzgados criminalmente. Rehusamos aceptar esa interpretación de esa Ley, con la mayor certeza de que la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico no tuvo eso en mente Y ni tan siquiera se le ocurrió.
Bajo ninguna alternativa debemos apartamos del propósito legislativo y sustituir el criterio y deseo del legislador por el de una opinión administrativa o el de un juez. Véase, R.E. Bemier y J.A. Cuevas Segarra, Aprobación e Interpretación de las leyes en Puerto Rico, San Juan, Publicaciones J.T.S., 1987, págs. 241-247, y la progenie de la jurisprudencia allí citada. Debemos recordar que la ley tiene que responder a su propósito; Chase Manhattan Bank v. Mun. de San Juan, 126 D.P.R. 759, 766 (1990); Vázquez v. A.R.P.E., 128 D.P.R. 513, 523-524 (1991); que los reglamentos no pueden ir más allá de lo autorizado por ley porque serían ultra vires, P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 409 (1980); Infante v. Tribunal Examinador de Médicos, 84 D.P.R. 308 (1961); y que "[e]l debido proceso de ley ni el derecho coexisten para exigir cosas imposibles...," ni que pudieran resultar en algo inútil o innecesario y sin razón o injusto. Pueblo v. Andréu González, 105 D.P.R. 315, 321 (1976); Pueblo v. Acabá Raíces, 118 D.P.R. 369, 374 (1987).
Corresponde a los tribunales armonizar las disposiciones de ley aplicables a la controversia que tiene ante su consideración, de manera que adopte aquella que ofrezca el "...resultado más sensato, lógico y razonable". Sucn. Alvarez Crespo y Otros v. Srio. de Justicia, 2000 J.T.S. 40, pág. 725.
En fin, como se dijo en Chévere, etc. v. Levis, 2000 J.T.S. 56, pág. 851:

“Sabido es que el legislador, al aprobar una ley, persigue como fin el 'tratar de corregir un mal, alterar una situación existente, completar una reglamentación vigente, fomentar algún bien específico o el bienestar general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno.' R.E. Bemier y J.A Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da. Ed. Rev., Publicaciones J.T.S., 1987, Vol. 1, págs. 245-246.

Al dilucidar una controversia y adjudicar los derechos de las partes, los tribunales 'deben interpretar las leyes aplicables a la situación de hechos que tienen ante sí, deforma que se cumpla cabalmente con intención legislativa.' Bemier y Cuevas Segarra, supra, pág. 241.

Para la justa solución del asunto que hoy nos ocupa debemos interpretar dicho precepto a la luz de la reconocida norma de hermenéutica de que '[l]as leyes debeN interpretarse y aplicarse en comunión con el propósito social que las inspira. No deben desvincularse del problema humano cuya solución persiguen, ni descarnarse de las realidades de la vida que la sociedad misma ha proyectado sobre ellas, pues se tornaría ilusorio y se perdería en el vacío el deseo de justicia que las genera.' Figueroa v. Díaz, 75 D.P.R. 163, 171 (1953). Véase, además: Pueblo v. Zayas Rodríguez, res. el 17 de febrero de 1999, 99 J.T.S. 16; y El Vocero de P.R. v. E.L.A., 131 D.P.R. 356, 432 (1992)”
Cuando se considera que la ley tiene una falla o no cubre las situaciones presentes, ello no se remedia avalando decisiones administrativas porque esa es "...una función que compete exclusivamente a la Asamblea Legislativa y trasciende el ámbito de la intervención judicial...". González Chemical v. Srio. de Hacienda, 86 D.P.R. 72, 78 (1962).
RAMON NEGRON SOTO
Juez de Apelaciones
ESCOLIOS VOTO CONCURRENTE DEL JUEZ NEGRON SOTO - 2001DTA 46
1. AUn aclarando que existe una gran diferencia entre la difusión pública y privada de videos, como el de marras, *807 reconocemos los peligros que se infieren de ello y las preocupaciones que recoge la C.E.E en su resolución. Le corresponde al legislador incorporarlas en la Ley Electoral o a la C.E.E. en sus reglamentos, si ésta considera tiene, facultad, en ley, asunto sobre el cual no expresamos criterio.
2. En dicho caso, el Tribunal Supremo consideró que eran anuncios a los fines del Artículo 8.001 las pegatinas, los rótulos, zafacones con emblemas, anuncios en los postes, en el centro de una cancha municipal, en los vehículos oficiales,, en el timbre del papel oficial del municipio y en camisetas. Ibid, pág. 238.
3. Señala la C.E.E que debemos considerar como precedente para la resolución de este caso, las expresiones del juez asociado señor Negrón García en su opinión concurrente emitida en P.P.D. v. Rosselló González, 95 J.T.S. 165-A, donde en su nota al calce número 12 establece que:

“Incluso hemos rechazado el ingenioso argumento de boletines informativos publicados regular y permanentemente, por la Oficina de Comunicaciones del Gobernador.

El que una publicación haya venido realizando antes deL período de veda del Artículo 8.00-1 de la Ley Electoral de Puerto Rico, supra, y esté sufragada regularmente, ¿desvirtúa su carácter de anuncio?; ¿pierde su calidad de gastos con fondos públicos que al Boletín de la Gobernación se le caracterice de 'naturaleza oficial y continua'?; ¿ establece, honestamente, alguna diferencia que lo prepare la propia Oficina de Comunicaciones y no una agencia de publicidad privada? En su origen, ¿de dónde provienen tales fondos? Estas interrogantes quedan contestadas al confrontamos con la innegable realidad de que es la sustancia y no la apariencia lo crucial y determinante; esto es, que la fuente verdadera son los fondos provenientes del erario público.

En todo esto, hay un eufemismo impermisible. Nada hay en la Constitución, en la Ley Electoral de Puerto Rico y en su historial en qué apoyar semejante proposición. Todo lo contrario -sin limite de tiempo- con referencia a toda propiedad mueble e inmueble gubernamental, por interacción recíproca, los Arts. 3.001 y 3.0012 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3108c y 3108d, respectivamente, proscriben su uso 'a los fines de hacer campaña política A favor o en contra de cualquier partido político o candidato', y la concesión a tales efectos de cualesquiera privilegios especiales. De manera expresa, el Art. 3.012 de la Ley Electoral de Puerto Rico, supra, consagra el principio constitucional igualitario de que '[tjodos los partidos políticos y candidatos y grupos independientes tendrán el mismo acceso y oportunidad!es1 — ’■

En resumen, el uso de fondos públicos para fines de propaganda partidista está prohibido, aUn cuando el Gobierno prescinda de los medios de difusión comercial pública del país o de agencias de publicidad privadas. ”

Aunque estas expresiones parecerían de primera instancia ser aplicables a la situación fáctica ante nos, debemos recordar que se tratan de un obiter dictum al resolver una situación diferente, pues allí existía el peligro real de la difusión al público en general, utilizando fondos públicos para difundir la obra de gobierno por medio de la utilización de los boletines informativos, peligro que no existe en la situación del caso de marras, donde el video sólo se le transmitió a los empleados municipales. Diferente podría ser la situación, si el video hubiese sido transmitido en vistas públicas ante las comisiones legislativas y otras agencias gubernamentales o en presencia o para los medios de comunicación pública.