| Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL I | | |
|---|---|---|
| Ex Agte. Jason Maldonado Rosado<br><br>Recurrido<br><br>v.<br><br>Negociado De La Policía De Puerto Rico<br><br>Recurrente | KLRA202400455 | *Revisión Judicial* procedente de la Comisión de Investigaciones Procesamiento y Apelación<br><br>Caso Núm. 19P-29<br><br>Sobre: Expulsión |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, y el Juez Rodríguez Flores.

Pagán Ocasio, juez ponente

## SENTENCIA

En San Juan, Puerto Rico, a 31 de octubre de 2024.

### I.

El 16 de agosto de 2024, el Negociado de la Policía de Puerto Rico (NPPR o parte recurrente) presentó un *Recurso de revisión administrativa* en el que solicitó que revoquemos una *Resolución* emitida por la Comisión de Investigación, Procesamiento y Apelación (CIPA o foro recurrido) el 21 de febrero de 2024.[1] En ese dictamen, la CIPA declaró Ha Lugar una apelación promovida por el señor Jason Maldonado Rosado (señor Maldonado Rosado o recurrido), revocó su expulsión como agente de la Policía de Puerto Rico y ordenó el pago al recurrido de los salarios que dejó de percibir desde que fue separado del cargo hasta la determinación de dicho organismo.

Ese mismo día, el NPPR radicó una *Solicitud para que se permita la presentación de una transcripción de la prueba oral y un alegato suplementario* en la que nos solicitó que le permitiéramos

---

[1] Notificada y archivada en autos el 12 de junio de 2024. Apéndice del *Recurso de revisión administrativa*, Anejo XXIX, págs. 80-85.

presentar una transcripción de la prueba oral (TPO) desfilada en la vista administrativa en su fondo, celebrada por la CIPA el 31 de enero de 2024.

El 21 de agosto de 2024, emitimos una *Resolución* en la que pautamos el proceso para regir la presentación de la TPO, según solicitado y los trámites para perfeccionar el recurso.

El 29 de agosto de 2024, el NPPR presentó una *Moción informativa* en la que adujo que había notificado copia del borrador de la TPO al recurrido para que fuera estipulado.

El 4 de septiembre de 2024, emitimos una *Resolución* en la que le ordenamos a las partes cumplir con nuestra *Resolución* del 21 de agosto de 2024 en términos del trámite procesal establecido.

El 20 de septiembre de 2024, ambas partes radicaron una *Moción conjunta para presentar la transcripción estipulada de la prueba oral desfilada en la vista administrativa* en la que sometieron la TPO de la vista administrativa, según estipulada.

El 25 de septiembre de 2024, emitimos una *Resolución* en la que le concedimos al recurrido hasta el 21 de octubre de 2024 para presentar su alegato en oposición al recurso.

El 17 de octubre de 2024, el señor Maldonado Rosado presentó un *Alegato en oposición* en el que solicitó que confirmemos la *Resolución* recurrida.

Con el beneficio de la comparecencia de las partes, damos por perfeccionado el *Recurso de revisión administrativa* y, en adelante, pormenorizaremos los hechos procesales relevantes a su atención.

**II.**

El caso de marras tiene su génesis el 20 de junio de 2018 cuando el Comisionado del NPPR, el señor Henry Escalera Rivera (Comisionado del NPPR), emitió una *Suspensión sumaria de empleo y sueldo y resolución de cargos de expulsión* en la que le informó al señor Maldonado Rosado que se proponía expulsarlo del puesto que

ocupaba como agente de la Policía de Puerto Rico.[2] De acuerdo con la misiva, una investigación preliminar del NPPR arrojó que, el 16 de junio de 2018, el recurrido agredió a la señora María C. Benítez Almodóvar (señora Benítez Almodóvar) – en ese entonces, su esposa – mediante un puño en la cabeza y en diferentes partes del cuerpo. Al igual, relató que, por estos hechos, al recurrido se le encontró causa probable para arresto por violación al Art. 3.1 (Maltrato) de la *Ley para la prevención e intervención con la violencia doméstica*, Ley Núm. 54 de 1989, según enmendada, 8 LPRA sec. 631 (Ley Núm. 54-1989), y se le diligenció una *Orden de protección Ex parte.* En consecuencia, le notificó al recurrido que cometió las faltas graves número 29, 31 y 32 de la Sección 14.6.1 del *Reglamento de Personal de la Policía de Puerto Rico*, Reglamento Núm. 4216 de 11 de mayo de 1990, Policía de Puerto Rico (Reglamento Núm. 4216), según enmendado por el *Reglamento para enmendar el Artículo 14 del Reglamento de Personal de la Policía de Puerto Rico*, Reglamento Núm. 9001, Policía de Puerto Rico, pág. 21 (Reglamento Núm. 9001). En concreto, le imputó como falta administrativa lo siguiente:

> 29. Observar una conducta lesiva, inmoral o desordenada en detrimento del Cuerpo de la Policía.
>
> 31. Incurrir en conducta que constituya delito grave o menos grave que implique depravación moral. Para efectos de esta falta no es necesario la radicación y el progreso de cargos criminales, solo basta que la investigación administrativa refleje que el querellado incurrió en una conducta tipificada, como delito grave o menos grave que implique depravación moral.
>
> 32. Incurrir en actos constitutivos de la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, "Ley de Violencia Doméstica". La investigación administrativa no dependerá de los resultados del caso criminal.[3]

Asimismo, la comunicación citó al señor Maldonado Rosado a una vista informal ante un Oficial Examinador y le informó que, de no asistir, la expulsión sería final y apelable ante la CIPA.

---

[2] Íd., Anejo I, págs. 5-7.
[3] Íd., pág. 6.

El 27 de agosto de 2018, el Comisionado del NPPR emitió una *Resolución final de expulsión* en la que confirmó la expulsión del recurrido.[4] En esa ocasión, le notificó que, de no estar conforme con la determinación, podría apelar ante la CIPA.

El 20 de septiembre de 2018, el señor Maldonado Rosado radicó una apelación ante la CIPA en la que solicitó que se revocara la *Resolución final de expulsión.*[5] Según expuso, no estaba de acuerdo con el dictamen, toda vez que fue encontrado no culpable en el caso criminal relacionado a los hechos ocurridos el 16 de junio de 2018.

El 29 de septiembre de 2022, las partes presentaron un *Proyecto informe de vista preliminar* en el que cada una anunció sus alegaciones, estipulaciones, prueba documental y testigos.[6] Por un lado, el NPPR avisó como testigos a la señora Benítez Almodóvar, los agentes Daniel Rivera Manfredy (agente Rivera Manfredy), Nancy Negrón Fuentes (agente Negrón Fuentes), Eliezer Almodóvar Santiago (agente Almodóvar Santiago) y Luis A. Ruiz Cordero (agente Ruiz Cordero). Por el otro lado, el señor Maldonado Rosado informó que testificaría él y uno de sus hijos, quien presuntamente intervino el día de los hechos.

El 24 de marzo de 2023, la CIPA emitió una *Notificación* en la que pautó la vista en su fondo para el 23 de mayo de 2023.[7]

En una moción con fecha del 2 de mayo de 2023, titulada *Sentencia sumaria,* el señor Maldonado Rosado solicitó a la CIPA que dictara sentencia sumaria ordenándole al NPPR reinstalar al recurrido y compensarle el salario dejado de devengar desde la expulsión.[8] Su contención era que los hechos señalados en su contra carecían de fundamentos porque los casos criminales fueron

---

[4] Íd., págs. 2-3.
[5] Íd., Anejo I, pág. 1-9.
[6] Íd., Anejo XIII, págs. 22-26.
[7] Íd., Anejo XIV, pág. 27.
[8] Íd., Anejo XV, págs. 28-41.

resueltos a su favor. A esos efectos, planteó que los siguientes tres (3) hechos no estaban en controversia:

1. Las denuncias presentadas al apelante, todas fueron resueltas a su favor, porque el Tribunal no las avaló.
2. Los testigos de la parte apelada declarar[á]n de las denuncias presentadas a favor del apelante.
3. Los fines de las denuncias eran para que lo despidieran y así ocurrió.[9]

Además, incluyó como documentos en apoyo de su solicitud: (1) una *Sentencia* emitida el 23 de agosto de 2018 por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI), en el caso JLE2018G0171, en la que se le declaró no culpable por el delito imputado de Maltrato, en violación del Art. 3.1 de la Ley Núm. 54-1989, *supra;*[10] (2) una *Resolución* de vista preliminar en alzada, emitida por el TPI el 13 de marzo de 2019 en la que no se encontró causa por el delito imputado de Incumplimiento de órdenes de protección, en violación al Art. 2.8 de la Ley Núm. 54-1989, *supra* sec. 628;[11] y (3) una *Sentencia* emitida el 6 de agosto de 2019 por el TPI en el caso JLE2019G0033 en la que se desestimó un cargo en contra del recurrido por violentar el Art. 2.8 de la Ley Núm. 54-1989, *supra.*[12]

El 16 de mayo de 2023, el NPPR radicó una *Moción informativa sobre testigo no disponible* en la que anunció a la CIPA que no tendría disponible como testigos al agente Ruiz Cordero, ni a la señora Benítez Almodóvar, a quien no se pudo diligenciar la citación porque se trasladó a los Estados Unidos y se desconocía su nueva dirección.[13] Por esa razón, solicitó al foro recurrido que admitiera una declaración certificada de la señora Benítez Almodóvar.

El 23 de mayo de 2023, la CIPA emitió una *Notificación* en la que le concedió al NPPR un término de treinta (30) días para

---

[9] Íd., pág. 33.
[10] Íd., págs. 35-36.
[11] Íd., págs. 37-39.
[12] Íd., págs. 40-41.
[13] Íd., Anejo XVI, págs. 42-47.

contestar la moción de sentencia sumaria promovida por el recurrido y señaló vista en su fondo para el 31 de enero de 2024.[14]

El 21 de julio de 2023, el NPPR presentó una *Moción para replicar solicitud del apelante de sentencia sumaria* en la que solicitó que se rechazara la solicitud de sentencia sumaria, puesto que existía controversia de hechos.[15] Según argumentó, el señor Maldonado Rosado plasmó únicamente meras alegaciones y no presentó prueba documental para apoyar que se dictara sentencia sumariamente como cuestión de derecho. Asimismo, planteó que los resultados del caso penal no impiden la aplicación de las medidas disciplinarias, según requiere el Reglamento Núm. 9001, *supra*, toda vez que son procedimientos completamente independientes. Por último, arguyó que los documentos del tribunal sometidos por el recurrido no atendían específicamente las alegaciones promovidas en contra de este.

El 17 de agosto de 2023, la CIPA emitió una *Orden* en la que declaró No Ha Lugar la solicitud de sentencia sumaria del recurrido.[16]

El 31 de enero de 2024, la CIPA celebró la vista en su fondo, cuyas incidencias quedaron transcritas en la TPO estipulada por las partes. En la vista, el NPPR presentó como testigos a los tres agentes: Ruiz Cordero, Negrón Fuentes y Almodóvar Santiago. Asimismo, sometió en evidencia: (1) una *Orden de protección Ex parte OPA 2018-017969*;[17] (2) el *Informe de intervención sobre*

---

[14] Íd., Anejo XVII, pág. 48.
[15] Íd., Anejo XX, págs. 51-54.
[16] Íd., Anejo XXI, pág. 55.
[17] Íd., Anejo XXIV, págs. 58-63. En las determinaciones de hechos de la orden, el TPI formuló: "Las partes están casadas legalmente y procrearon tres hijos, dos de ellos menores de edad en la actualidad. La peticionaria, acompañada del Agte. Ruiz Cordero de la Unidad de Violencia Doméstica de la Policía de Puerto Rico, placa 28319, declara bajo juramento, que siente temor ante patrón de acecho que ha ejercido el peticionado en su contra. Se encuentran separados y el 28 de mayo de 2018, se presentó la demanda de divorcio. Sostiene que el peticionado no acepta que la relación culminó y realiza llamadas telefónicas constantes a su celular, al trabajo y a familiares. Sostiene que al no contestar el teléfono el peticionado se torna agresivo y le escribe: "contesta el cabrón teléfono", manifestándole además, que enviará a alguien a su hogar. La peticionaria tuvo

*violencia doméstica,* preparado por la agente Negrón Fuentes el 16 de junio de 2018;[18] (3) la *Orden de protección OPA-2018017969,* emitida el 6 de julio de 2018 con vigencia de un (1) año;[19] y (4) unas fotografías de la señora Benítez Almodóvar, tomadas el mismo día del incidente. A su vez, la CIPA se reservó su decisión respecto a la admisión en evidencia de unas fotografías del celular de la señora Benítez Almodóvar de unos alegados mensajes enviados por el señor Maldonado Rosado. Entretanto, el recurrido declaró sobre su versión de los hechos y presentó en evidencia la *Sentencia* dictada por el TPI en el caso JLE20180171.

Como se desprende de la TPO, estipulada por las partes, el agente Ruiz Cordero, placa 28319, declaró que:

(1) Para el 16 de junio de 2018 trabajaba en la Policía de Puerto Rico en la División de Asuntos Juveniles y Violencia Doméstica en el área de Ponce. Laboraba allí desde el 2012.[20]

(2) Conoció a la señora Benítez Almodóvar porque le fue asignada una querella bajo la Ley Núm. 54-1989, *supra,* por unas palabras soeces que le habían sido enviadas por mensaje de texto.[21]

(3) La señora Benítez Almodóvar le indicó que el número telefónico desde el que recibió los mensajes pertenecía a

---

que bloquearlo en el teléfono y el peticionado insistentemente llama a los hijos menores y al padre de la peticionaria para lograr contacto con esta. La peticionaria tiene temor de que el peticionado llegue a Puerto Rico en cualquier momento.

De conformidad a la prueba presentada, el Tribunal tiene motivos suficientes para creer que la peticionaria es víctima de violencia doméstica y existe probabilidad de provocar un daño irreparable, por lo cual, se expide orden de protección provisional. Se conceden los remedios solicitados y se ordena a la Unidad de Violencia Doméstica a realizar las gestiones correspondientes para diligenciar la orden en el estado de Texas."

[18] Íd., Anejo XXV, págs. 64-66.

[19] Íd., Anejo XXVI, págs. 67-72. En las determinaciones de hechos, el TPI formuló: "Las partes están casadas legalmente desde el año 1996. La peticionaria teme por su seguridad, alegando que el peticionado se encontraba en Texas en búsqueda de mejores oportunidades de trabajo, que la llamaba constantemente y le hacía amenazas; que el peticionado llegó a Puerto Rico el 16 de junio de 2018 y la llamó para que lo recogiera a su regreso, diciéndole que fuera sola; que al llegar a la casa le hizo expresiones sobre su aspecto y sobre su relación; que posteriormente forcejearon y el peticionado la agredió en varias ocasiones y que el peticionado le pidió unas llaves de un vehículo y ella se negó a entregarlas. La peticionaria presentó una querella en la Policía por dicho incidente. Celebrada la vista al amparo de la Regla 6 hubo determinación de Causa Probable, así como en [l]a Vista Preliminar. El caso fue señalado para Juicio. Por su parte, el peticionado alegó que la peticionaria lo llamó; que fue a la residencia a hablar y que este lo agredió.

Considerada la prueba presentada y derimida [sic] la credibilidad que no[s] mereció el testimonio de las partes, se expide orden de protección [por] el término de un (1) año. Las partes manifestaron entender el alcance de la Orden de Protección expedida".

[20] TPO estipulada, pág. 7, líneas 1-12.

[21] Íd., líneas 13-22.

su esposo, el señor Maldonado Rosado, de quien había estado separada por dos (2) años y se encontraba en trámites de divorcio.[22]

(4) Pudo ver los mensajes, presentados por el NPPR y no admitidos por la CIPA, los cuales calificó como "denigrantes" y le provocaron a ella que se sintiera ofendida. Por eso, procedió a acompañarla al TPI para solicitar una orden de protección *ex parte*, la cual fue expedida y diligenciada por otra persona.[23]

(5) En las fotos de los mensajes no aparece número alguno, sino "Maldonado". Únicamente fueron identificados por la señora Benítez Almodóvar como mensajes enviados por el señor Maldonado Rosado.[24]

(6) La jueza que expidió la orden de protección vio esos mismos mensajes y, a base de ellos, determinó que existía peligrosidad suficiente para emitirla.[25]

(7) Él no tenía certeza de que los mensajes fueran enviados por el señor Maldonado Rosado, pero la señora Benítez Almodóvar, quien no estaba presente en la vista administrativa, sí.[26]

(8) La jueza habló o le preguntó a la señora Benítez Almodóvar sobre los mensajes de texto.[27]

Por otra parte, la agente Negrón Fuentes, placa 19970, testificó que:

(1) Trabajaba para la División de Violencia Doméstica para el 16 de junio de 2018.[28]

(2) Ese día ofrecía servicio nocturno y conoció a la señora Benítez Almodóvar luego de que se le asignara investigar una querella de violencia doméstica en el Cuartel de la Playa de Ponce.[29]

(3) Como parte de ello, le tocó entrevistar a la señora Benítez Almodóvar a las 2:00 p.m., quien le manifestó que era pareja del señor Maldonado Rosado con quien llevaba casada veintiún (21) años, había procreado tres (3) hijos y de quien llevaba separada desde agosto de 2017.[30]

(4) La señora Benítez Almodóvar le relató que:
   a) Ese mismo día, el 16 de junio de 2018, a las 6:00 a.m. había recibido llamadas del señor Maldonado Rosado, quien le solicitó que lo buscara al aeropuerto.[31]
   b) Le indicó que no lo haría y que si él quería que llegara a su residencia.[32]
   c) Quería que el recurrido llegara a la residencia para que la Policía diligenciara la *Orden de protección* pendiente.[33]
   d) El señor Maldonado Rosado llegó a la residencia entre 6:40 a.m. y 7:00 a.m. y ambos empezaron a conversar sobre el divorcio, la orden de protección y una pareja que tenía la señora Benítez Almodóvar.[34]
   e) El recurrido le increpó sobre la persona y esta se negó a contestarle.[35]

---

[22] Íd., pág. 8, líneas 6-15.
[23] Íd., pág. 10, líneas 1-5, y pág. 16, líneas 1-8.
[24] Íd., pág. 11, líneas 11-12, y pág. 12, líneas 1-4.
[25] Íd., pág. 17, líneas 18-21.
[26] Íd., pág. 18, líneas 21-23.
[27] Íd., pág. 20, líneas 1-5.
[28] Íd., pág. 24, líneas 1-5.
[29] Íd., pág. 24, líneas 19-25, y pág. 25, líneas 1-7.
[30] Íd., líneas 9-20.
[31] Íd., pág. 25, líneas 22-25.
[32] Íd., pág. 26, líneas 1-3.
[33] Íd., líneas 5-9.
[34] Íd., líneas 10-14.
[35] Íd., líneas 15-17.

   f) Acto seguido, el señor Maldonado Rosado se molestó y la agredió con un puño en el área entre la oreja y la cabeza.[36]

   g) Producto del golpe, ella cayó al piso y comenzó a gritar. Mientras tanto, estando ella en el piso, el señor Maldonado Rosado la continuaba agrediendo en diferentes partes de la cabeza.[37]

   h) Un menor, hijo de la pareja, salió al área de la marquesina en la que se encontraban, intervino y empujó al señor Maldonado Rosado.[38]

   i) Luego de que el menor los separara, ella se dirigió hasta su habitación para llamar a la Policía de Puerto Rico y el señor Maldonado Rosado la siguió, entró al cuarto, la haló por el pelo, rompió la camiseta que ella tenía puesta y le exigió las llaves de un auto.[39]

   j) Nuevamente, el menor intervino, ella se trasladó hasta la lavandería y llamó a la Policía. Entretanto, el señor Maldonado Rosado se fue de la residencia caminando.[40]

(5) Al entrevistar a la señora Benítez Almodóvar, esta lloraba, tenía laceraciones e indicaba que le dolía al lado izquierdo de la cabeza, detrás de la oreja.[41]

(6) La señora Benítez Almodóvar tenía una laceración en una de las manos, cerca del meñique y en el brazo izquierdo. Por eso, se le tomaron fotos y la señora Negrón Fuentes documentó la localización de los golpes en el *Informe de intervención sobre violencia doméstica.*[42]

(7) La señora Benítez Almodóvar fue atendida en el Metro Pavía de Ponce.[43]

(8) Cuando entrevistó al señor Maldonado Rosado, este le expresó que el agredido había sido él y que se le rompió un dedo.[44]

(9) Por los hechos ocurridos, al señor Maldonado Rosado se le radicaron cargos. Sobre estos, luego fue declarado no culpable.[45]

(10) La agente Negrón Fuentes diligenció la orden de protección en el Cuartel.[46]

Por otra parte, el agente Almodóvar Santiago declaró que:

(1) Trabajaba para la Policía de Puerto Rico desde el 1999 y el 16 de junio de 2018 se desempeñaba en la Unidad de Servicios Técnicos, dedicado a tomar fotos de todo tipo de escena criminal.[47]

(2) Tomó las fotos admitidas como Exhibit #5 del NPPR en las que aparece la señora Benítez Almodóvar.[48]

(3) Tomó fotos de los lugares en donde la señora Benítez Almodóvar le indicaba que había sufrido golpes.[49]

---

[36] Íd., líneas 18-19.
[37] Íd., líneas 20-21.
[38] Íd., líneas 21-24.
[39] Íd., pág. 27, líneas 7-12.
[40] Íd., líneas 13-16.
[41] Íd., pág. 27, líneas 17-24 y pág. 28, líneas 1-9.
[42] Íd., pág. 28, líneas 10-13 y pág. 31, líneas 1-10.
[43] Íd., pág. 31, líneas 17-18.
[44] Íd., pág. 32, líneas 23-25 y pág. 33, líneas 12-17.
[45] Íd., pág. 36, líneas 3-25 y pág. 38, líneas 1-7.
[46] Íd., pág. 38, líneas 18-25.
[47] Íd., pág. 45, líneas 19-25, y pág. 46, líneas 3-12.
[48] Íd., pág. 48, línea 9.
[49] Íd., pág. 52, líneas 18-24.

(4) Además de la localización de los golpes y las lesiones, la señora Benítez Almodóvar le expresó que fue su esposo, el señor Maldonado Rosado quien los causó.[50]

(5) Los golpes exhibidos por la señora Benítez Almodóvar podrían ser causados por acciones defensivas del señor Maldonado Rosado. Asimismo, una persona podría darse un golpe en la cabeza, cayéndose hacia atrás, tratando de defenderse.[51]

Por último, el señor Maldonado Rosado testificó que:

(1) Para el 16 de junio de 2018, había trabajado veintidós (22) años para la Policía de Puerto Rico.[52]

(2) Para el momento de la vista, se encontraba desempleado.[53]

(3) El 16 de junio de 2018, llegó a Puerto Rico a las 3:00 a.m. y pese a que había coordinado con la señora Benítez Almodóvar que esta lo iba a recoger en el Aeropuerto Internacional Mercedita, ella se negó a hacerlo y le indicó que podían discutir el asunto del divorcio una vez él llegara a la casa de ella.[54]

(4) Desconocía que se había expedido una orden de protección en su contra.[55]

(5) Llegó hasta la residencia de la señora Benítez Almodóvar, la llamó múltiples veces y luego ella salió a hablar con él en la marquesina.[56]

(6) Mientras la señora Benítez Almodóvar estaba recostada de un vehículo, él le manifestó que no lo buscó al aeropuerto según acordado y que ella se veía flaca y demacrada en comparación con la última vez en que la vio.[57]

(7) Acto seguido, la señora Benítez Almodóvar se tornó agresiva, le respondió que su estado físico no era problema de él y profirió malas palabras. A lo cual, él respondió intentando apaciguar la situación, pero ella se tornó violenta, intentó arañarle la mano derecha y el área de la cara. En respuesta, él "falló en agarrar", ella le arañó el área del pecho y él la logró agarrar, teniendo contacto con ella por los antebrazos y la muñeca.[58]

(8) La señora Benítez Almodóvar se deslizó hacia el lado izquierdo del vehículo, cayó de espaldas al pavimento mientras lo agarraba y él la agarraba por el antebrazo. Por eso, él cayó sobre ella y tenía los puños en el área del piso.[59]

(9) La señora Benítez Almodóvar logró soltarse y lo agarró nuevamente. En ese momento, un menor, hijo de ambos, intervino, preguntando qué pasaba. En respuesta, el señor Maldonado Rosado expresó que la señora Benítez Almodóvar lo tenía aguantado por la camisa.[60]

(10) El menor lo haló hacia atrás y el señor Maldonado Rosado cayó de espalda, producto de lo cual le entablillaron un dedo.[61]

---

[50] Íd., pág. 53, líneas 20-25, y pág. 54, líneas 1-3.
[51] Íd., pág. 56, líneas 10-18.
[52] Íd., pág. 58, línea 19.
[53] Íd., línea 17.
[54] Íd., pág. 59, líneas 1-10.
[55] Íd., línea 13-18.
[56] Íd., línea 20-23.
[57] Íd., pág. 60, líneas 6-15.
[58] Íd., líneas 13-25.
[59] Íd., pág. 60, línea 25, y pág. 61, líneas 1-5.
[60] Íd., pág. 61, líneas 5-8.
[61] Íd., líneas 8-10. En específico, el señor Maldonado Rosado expresó "Él salió, me levanta y del mismo... cuando él me hala hacia atrás yo caigo de espalda que inclusive me entablillaron el dedo en el mismo hospital que la atendieron a ella,

(11) En la noche del 16 de junio de 2018, la agente Negrón Fuentes lo entrevistó y él le expresó que había sido agredido también.[62]

(12) Él no envió los mensajes que el NPPR ofreció como evidencia, los cuales fueron preparados por alguien para que parecieran enviados por él.[63]

(13) Él intentó demostrar en el caso criminal capturas de imágenes de su celular para probar que no había emitido los mensajes.[64]

(14) Antes de ser entrevistado, le indicó al sargento Pedro Torres, supervisor de la agente Negrón Fuentes, que había sido agredido, pero no presentó querella alguna ante la Policía de Puerto Rico.[65]

(15) No presentaría evidencia alguna ante la CIPA sobre el alegado esquema en su contra para editar los mensajes para que parecieran emitidos por él. Tampoco presentaría las capturas de imágenes que intentó someter ante el TPI.[66]

El 21 de febrero de 2024, la CIPA emitió la *Resolución* recurrida en la que declaró Ha Lugar la apelación del señor Maldonado Rosado, revocó la expulsión y ordenó que fuera compensado por los salarios que dejó de percibir desde la separación del cargo.[67] A su juicio, el NPPR no presentó prueba clara, robusta y convincente para justificar la expulsión del recurrido.

En el dictamen, el foro recurrido realizó las siguientes determinaciones de hechos:

1. El Ex Agte. Jason Maldonado Rosado #24997, estaba adscrito al Distrito de Aibonito en el Centro de Reemplazo Área de Aibonito. El Ex Agte Maldonado Rosado por 22 años formó parte de la Policía de Puerto Rico.

2. El Ex Agte. Maldonado Rosado para la fecha de los alegados hechos estaba separado de la quién [sic] era su esposa, la señora María C. Benítez Almodóvar.

3. El Ex Agte Maldonado Rosado llegó al hogar de la señora Benítez Almodóvar para recoger un vehículo de motor y hablar sobre el divorcio de ambos. Una vez en la casa la señora Benítez Almodóvar comnezó [sic] una confrontación física con el ex Agte Maldonado. Dicha confrontación física culminó ya que el hijo de ambos los separó.

4. Surge del expediente que al Ex Agte Jason Maldonado Rosado #24997, se le presentó en el [T]ribunal de Primera Instancia Sala de Ponce, un (1) cargo criminal grave por violación al artículo 3.2 (a) de la Ley 54-1989 conocida como la ley para la prevención e intervención con la violencia doméstica por amenaza.

---

luego de que me radican el… horas de la noche, que ya yo tenía inclusive hasta un grillete".

[62] Íd., pág. 62, líneas 11-12.

[63] Íd., pág. 63, líneas 8-21.

[64] Íd., pág. 63, línea 25, y pág. 64, líneas 1-6.

[65] Íd., pág. 67, líneas 18-20.

[66] Íd., pág. 68, líneas 15-19, y pág. 69, líneas 17-21.

[67] Notificada y archivada en autos el 12 de junio de 2024. Apéndice del *Recurso de revisión administrativa*, Anejo XXIX, págs. 080-085.

5. El caso fue sometido ante la Honorable Juez, Enid Cristina Rivera García, quien luego de escuchar la prueba determinó causa probable para arresto en contra del Ex Agte Maldonado Rosado bajo el Art. 3.1. Ley 54-1989, le impuso una fianza de treinta mil dólares ($30,000) y ordenó la supervisión electrónica. Se expidió una orden de protección Ex parte a favor de la señora María C. Benítez Almodóvar.

6. El 16 de julio de 2018, en el Tribunal de Primera Instancia Sala Superior de Ponce mediante sentencia, el Honorable Juez Ángel M. Lla[v]o[n]a Folguera, declaró No Culpable al Ex Agte. Maldonado Rosado del delito imputado bajo el Art. 3.1 Ley 54-1989.

7. No obstante lo anterior, el apelante fue expulsado de la Policía de Puerto Rico.[68]

Entretanto, el foro recurrido consignó que el agente Ruiz Cordero declaró que:

(1) Entrevistó a la señora Benítez Almodóvar;

(2) Se dejó llevar por unas fotos de mensajes de texto alegadamente enviados por el señor Maldonado Rosado;

(3) Acompañó a la señora Benítez Almodóvar al TPI para la expedición de una *Orden de protección Ex Parte* y la diligenció;

(4) No conocía el número de teléfono del señor Maldonado Rosado;

(5) Las fotos de los alegados mensajes no presentaban el número del recurrido;

(6) Que la señora Benítez Almodóvar conocía el número, pero no estaba presente en la vista.

Sobre las declaraciones de la agente Negrón Fuentes, reseñó que esta testificó que:

(1) Entrevistó a la señora Benítez Almodóvar en la tarde del día de los hechos, ocurridos en horas de la mañana.

(2) Entrevistó al señor Maldonado Rosado, quien le indicó que había sido agredido por la señora Benítez Almodóvar.

(3) La Policía de Puerto Rico no hizo nada respecto a esa alegación.

(4) Dos agentes intervinieron en el lugar de los hechos, pero no estaban presentes en la vista.

Sobre el testimonio del agente Almodóvar Santiago recogió únicamente que este expresó que, el día de los hechos, tomó las fotografías admitidas en evidencia sobre las alegadas lesiones de la señora Benítez Almodóvar.

Ahora bien, entre sus conclusiones de derecho, el foro recurrido incluyó valoraciones que solamente pueden interpretarse como determinaciones de hechos. En ese sentido, concluyó que:

---

[68] Íd., págs. 80-81.

(1) De las fotos sometidas no se desprenden golpes en el rostro, ni el cuello de la señora Benítez Almodóvar.

(2) Las lesiones marcadas por la señora Benítez Almodóvar en el *Informe de intervención sobre violencia doméstica* no son cónsonas con las fotografías.

(3) En una de las fotos se aprecia un leve raspón en el hombro.

(4) En otra, se puede ver un somero raspón en el antebrazo y un raspón en el nudillo.

(5) En otra, no se observan señales del alegado puño en la cabeza que recibió Benítez Almodóvar.

(6) No surge del expediente algún informe médico sobre las lesiones sufridas por la señora Benítez Almodóvar, atendida en el CDT Metro Pavía.

Asimismo, destacó que:

(1) La señora Benítez Almodóvar no compareció a testificar, por lo que la Comisión no cuenta con su versión de los hechos.

(2) El señor Maldonado Rosado compareció y ofreció su versión de los hechos.

(3) Los hechos fueron juzgados por el TPI y el recurrido fue declarado No Culpable.

(4) Determinó no admitir las fotos de los mensajes de texto alegadamente enviados por el recurrente por falta de corroboración, ya que el NPPR no pudo establecer cuál era el número de celular del teléfono que lo envió y si este le pertenecía al recurrente. Además, puntualizó que, en algunas imágenes, no se podía leer el contenido de los mensajes.

El 1 de julio de 2024, el NPPR radicó una *Moción en solicitud de reconsideración* en la que solicitó a la CIPA que reconsiderara su determinación porque la evidencia testifical y documental era suficiente para sostener la acción disciplinaria tomada en este caso.[69] En apoyo de esa posición, planteó que, como parte del procedimiento para obtener la orden de protección, la señora Benítez Almodóvar declaró bajo juramento ante el TPI. Por eso, adujo que, basándose en ese testimonio sobre actos de maltrato del recurrido, el foro primario emitió la orden. Asimismo, esbozó que la CIPA contó con la versión de la señora Benítez Almodóvar a través del testimonio de la agente Negrón Fuentes, quien la entrevistó el 16 de junio de 2018. Por último, arguyó que esa agente explicó el estado físico en el que se encontraba la señora Benítez Almodóvar y expresó que esta

---

[69] Íd., Anejo XXXII, págs. 89-92. Rechazada de plano por la CIPA.

tenía laceraciones en el lado izquierdo de la cabeza, las manos y el brazo izquierdo.

Inconforme, el NPPR presentó el *Recurso de revisión administrativa* de epígrafe y le imputó a la CIPA la comisión de los siguientes errores:

> A. Erró la CIPA y cometió un craso abuso de discreción al otorgarle importancia excesiva a que el señor Maldonado Rosado fuera declarado no culpable en el procedimiento criminal.
>
> B. Erró la CIPA y cometió un craso abuso de discreción al darle un peso excesivo a que la víctima de violencia doméstica no presentó su testimonio y concluir que no cuenta con su versión de los hechos, a pesar de que esta surge de la evidencia testifical y documental presentada por el NPPR.
>
> C. Erró la CIPA erró y cometió un craso abuso de discreción al no hacer una evaluación justa de la totalidad de la prueba presentada por el NPPR y así, concluir que era insuficiente para sostener la medida disciplinaria de expulsión por la conducta constitutiva de la comisión de las faltas graves, 29, 31 y 32.

En los méritos, su posición es que la evidencia documental y testifical sustenta la comisión de faltas graves por el señor Maldonado Rosado, las cuales justifican su expulsión. Al igual, esboza que la CIPA debió admitir en evidencia las fotos del teléfono de la señora Benítez Almodóvar y que fue irrazonable al concluir que las lesiones marcadas en el *Informe de intervención sobre violencia doméstica* no eran cónsonas con las fotografías tomadas por el agente Almodóvar Santiago. Además, arguye que el señor Maldonado Rosado reconoció la agresión al admitir que él también fue agredido.

A su vez, plantea que la imposición administrativa de una medida disciplinaria no depende de los resultados del caso criminal, ni de la presentación de cargos criminales, tal y como lo establece la jurisprudencia y el Reglamento Núm. 4216, *supra*. También, denuncia que la CIPA elevó incorrectamente el peso de la prueba aplicable a este caso al equipararlo al de más allá de duda razonable. Por último, aduce que no era indispensable que la señora Benítez

Almodóvar declarara en la vista administrativa para demostrar la comisión de las faltas y requerirlo de esa forma resultaría en la imposibilidad de sostener acciones disciplinarias.

En apoyo de la *Resolución* recurrida, el señor Maldonado Rosado compareció mediante un *Alegato en oposición* en el que solicitó que confirmemos el dictamen. A su entender, toda la evidencia sometida por el NPPR debía ser excluida por tratarse de prueba, fruto del árbol ponzoñoso, puesto que se derivó de que la señora Benítez Almodóvar utilizó las redes sociales y teléfonos para fabricar evidencia y presentarla para la formulación de cargos con el fin único de exponer detalles de manera deshonorable en contra del recurrido. Asimismo, esboza que la incomparecencia de esta hace que se presuma que lo que declararía no era correcto. Por esas razones, argumenta que la CIPA resolvió correctamente al entender que todo fue producto de una maquinación y que el foro recurrido no es capaz de cometer un craso abuso de discreción, debido a que está compuesto por jueces retirados que han rendido un buen servicio. Por último, reitera que, según fue demostrado en la vista en su fondo, fue la señora Benítez Almodóvar quien atacó al señor Maldonado Rosado, mientras que la determinación de no culpabilidad confirma que él no fue el agresor.

Resumidos los hechos procesales, pormenorizamos el derecho aplicable a la controversia presentada por el *Recurso de revisión administrativa* de epígrafe.

**III.**

**A.**

La *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, Ley Núm. 38 de 2017, según enmendada, 3 LPRA secs. 9601 *et seq.*, (LPAU) establece el alcance de la revisión judicial de las determinaciones de las agencias administrativas. A tenor de esta y la jurisprudencia aplicable, la revisión judicial consiste,

esencialmente, en determinar si la actuación de la agencia se dio dentro de las facultades que le fueron conferidas por ley, si es compatible con la política pública que la origina y si es legal y razonable. *Capó Cruz v. Junta de Planificación*, 204 DPR 581, 590-591 (2020); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). Es decir, que este tipo de revisión busca limitar la discreción de las agencias y garantizar que estas desempeñen sus funciones de acuerdo con los confines de la ley. *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 891-892 (2008). De la mano con esto, es norma reiterada de derecho que los foros revisores le concederán gran deferencia y consideración a las decisiones de las agencias administrativas, debido a la vasta experiencia y el conocimiento especializado sobre los asuntos que le fueron delegados. *Graciani Rodríguez v. Garage Isla Verde, LLC,* 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, supra. Conforme a ello, los tribunales deben ser cautelosos al intervenir con las decisiones de los organismos administrativos. *Metropolitana, S.E. v. A.R.Pe.*, 138 DPR 200, 213 (1995); *Gallardo v. Clavell*, 131 DPR 275, 289–290 (1992).

Por las razones antes aludidas, las decisiones de las agencias administrativas gozan de una presunción de regularidad y corrección. *Capó Cruz v. Junta de Planificación*, supra; *Rolón Martínez v. Supte. Policía*, supra; *García Reyes v. Cruz Auto Corp.*, supra, pág. 892. La presunción de corrección que acarrea una decisión administrativa deberá sostenerse por los tribunales a menos que la misma logre ser derrotada mediante la identificación de evidencia en contrario que obre en el expediente administrativo. *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 130 (1998).

Así, al momento de revisar una decisión administrativa, el criterio rector para los tribunales será la razonabilidad en la actuación de la agencia. *Rebollo v. Yiyi Motors,* 161 DPR 69, 76

(2004). Cónsono con ello, será necesario determinar si la agencia actuó de forma arbitraria, ilegal o de manera tan irrazonable que su actuación constituyó un abuso de discreción. ***Rolón Martínez v. Supte Policía,*** supra.

Según ha quedado establecido como norma general, el ejercicio de revisión judicial de una decisión administrativa se limita a tres asuntos: (1) la concesión del remedio apropiado; (2) la revisión de las determinaciones de hecho conforme al criterio de evidencia sustancial que obra en el expediente administrativo; y (3) la revisión completa y absoluta de las conclusiones de derecho. ***Asoc. Fcias. v. Caribe Specialty et al. II***, 179 DPR 923, 940 (2010).

De esta forma, en el contexto de las <u>determinaciones de hechos</u> realizadas por las agencias administrativas, nuestro más alto foro ha pautado que los tribunales no deben intervenir o alterar las determinaciones de hechos de un organismo administrativo "si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad". ***Otero Mercado v. Toyota****,* 163 DPR 716, 727-728 (2005); ***Domínguez v. Caguas Expressway Motors, Inc.***, 148 DPR 387, 397 (1999). Dentro de este marco, evidencia sustancial se entiende como "aquella evidencia pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión". ***Ramírez v. Depto. de Salud***, 147 DPR 901, 905 (1999). Por ello, la parte que alegue que alegue ausencia de evidencia sustancial debe demostrar que existe:

> "[O]tra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial [...] hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba" que tuvo ante su consideración. ***Metropolitana S.E. v. A.R.Pe.***, 138 DPR 200, 213 (1995) citando a ***Hilton Hotels International, Inc. v. Junta de Salario Mínimo****,* 74 DPR 670, 686 (1983).

En otras palabras, la parte recurrente tiene la obligación de derrotar la presunción de corrección de los procesos y de las decisiones administrativas. *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 DPR 521, 532 (1993). Si no demuestra que existe esa otra prueba, las determinaciones de hechos del organismo administrativo deben ser sostenidas por el tribunal revisor. *Ramírez v. Depto. de Salud*, supra.

Ahora bien, cuando se trate de conclusiones de derecho que no envuelvan interpretaciones dentro del área de especialización de la agencia, éstas se revisarán por los tribunales sin circunscribirse al razonamiento que haya hecho la agencia. *Capó Cruz v. Junta de Planificación*, supra; *Pacheco v. Estancias*, 160 DPR 409, 432 (2003); *Rivera v. A & C Development Corp.*, 144 DPR 450, 461 (1997). Cuando las determinaciones de las agencias estén entremezcladas con conclusiones de derecho, el tribunal tendrá amplia facultad para revisarlas, como si fuesen una cuestión de derecho propiamente. *Pacheco v. Estancias*, supra, pág. 433; *Rivera v. A & C Development Corp.*, *supra*. En nuestro ordenamiento jurídico, es norma reiterada que, en el proceso de revisión judicial, los tribunales tienen la facultad de revocar al foro administrativo en materias jurídicas. Véase, además, la Sec. 4.5 de LPAU, *supra* sec. 9675.

Es pertinente señalar que nuestro sistema de adjudicación administrativo busca "alentar la solución informal de las controversias", según establece la Sec. 1.2 de la LPAU, *supra* sec. 9602. Para ello, la LPAU permite que las agencias establezcan las reglas y procedimientos que regirán ante sí para la solución rápida e informal de las controversias; siempre salvaguardando los derechos garantizados por ley. Íd. Por lo cual, las agencias no quedan sometidas a un procedimiento rígido que obstaculiza la producción de una solución rápida, justa y económica. Íd.

En suma, la referida deferencia debe ceder cuando se demuestre que: (1) la decisión no está basada en evidencia sustancial; (2) la agencia ha errado en la aplicación de la ley; (3) la actuación de la agencia resulta ser arbitraria, irrazonable o ilegal; y (4) la actuación administrativa lesiona derechos constitucionales fundamentales. *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800, 822 (2012) (*citando a* **Empresas Ferrer v. A.R.PE.**, 172 DPR 254, 264 (2007)).

**B.**

En reiteradas ocasiones, nuestro Tribunal Supremo ha sostenido que existe independencia entre las acciones disciplinarias administrativas y la acción penal del Estado. ***Trib. Exam. Méd. v. Cañas Rivas,*** 154 DPR 29, 37 (2001); ***In re Calzada Llanos,*** 124 DPR 411, 425, (1989); ***In Re Rodríguez Caraballo,*** 106 DPR 792, 799 (1978). Incluso más, ha sido tajante y claro al sentenciar que: "[l]a absolución penal no confiere inmunidad en el campo administrativo". Íd., citando a ***Pagán Hernández v. UPR,*** 107 DPR 720, 749 (1978). Esto, pues cada acción tiene un propósito distinto y posee diferentes grados o *quantums* de prueba. Íd. Al respecto, nuestro más alto foro ha establecido que, en el procedimiento disciplinario, no es necesario probar los hechos igual que en un caso criminal. Íd. Asimismo, ha dejado claro que el hecho de que una persona haya sido juzgada y absuelta en un proceso penal no impide que se formulen y diluciden cargos administrativos en su contra por los mismos hechos que motivaron el caso penal. Íd.; ***San Vicente v. Policía de PR,*** 142 DPR 1, 3 (1996); ***Pagán Hernández v. UPR,*** supra; ***Mundo v. Tribunal Superior,*** 101 DPR 302 (1973).

Y es que lo contrario implicaría maniatar a toda autoridad nominadora y privarle de las prerrogativas que le confiere la ley en cuanto a destituciones. ***San Vicente v. Policía de PR,*** supra, citando a ***Cruz v. Garrido Morales,*** 58 DPR 653, 663 (1941).

Además, cabe recabar en que la independencia entre ambas acciones surge, en parte, de los distintos grados de prueba requeridos en cada uno. ***Trib. Exam. Méd. v. Cañas Rivas,*** supra; D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 3era ed., Colombia, Forum, pág. 729. Sabido es que, en la esfera criminal, los delitos imputados deben probarse más allá de duda razonable. Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110. Entretanto, en un procedimiento administrativo, los hechos deben probarse mediante preponderancia de la prueba testifical y documental. Es decir, se requiere que exista evidencia sustancial que apoye el hecho. ***Otero Mercado v. Toyota***, supra; Fernández Quiñones, op. cit. Resultaría impropio requerir más que eso para probar un hecho ante un foro administrativo. Aún más, nuestro más alto foro ha expresado precisamente que la conducta de un miembro de la Policía de Puerto Rico a quien se le imputa la comisión de faltas bajo el Reglamento de Personal aplicable no tiene que ser probada más allá de duda razonable. ***Reyes Salcedo v. Policía de PR,*** 143 DPR 85, 96 (1997); ***Pagán Hernández v. UPR,*** supra, pág. 749; ***Mundo v. Tribunal Superior,*** supra, pág. 306.

## C.

Para reglamentar la conducta del personal de la Policía de Puerto Rico, ese organismo promulgó el Reglamento Núm. 4216, *supra.* Más recientemente, la Policía de Puerto Rico enmendó el Reglamento Núm. 4216, *supra,* mediante la aprobación del Reglamento Núm. 9001, *supra,* en aras de actualizar el andamiaje disciplinario de la Uniformada.

En lo pertinente, según enmendada, la sección 14.6.1 del Reglamento Núm. 4216, *supra,* clasifica las faltas graves y leves en las que podrían incurrir miembros de la Policía, así como las sanciones disciplinarias que apareja la comisión de estas. En

específico, la Falta Administrativa Núm. 29 se prohíbe "[i]ncurrir en una conducta lesiva, inmoral o desordenada en detrimento del Cuerpo de la Policía". Reglamento Núm. 9001, *supra* pág. 21. Una primera infracción conllevaría la suspensión por cuarenta (40) días; la segunda, setenta (70) días; la tercera, ciento veinte (120) días. Íd. Mientras tanto, la Falta Grave Administrativa Núm. 31 prescribe:

> 31. Incurrir en conducta que constituya delito grave o menos grave que implique depravación moral. **Para efectos de esta falta no es necesario la radicación y el progreso de cargos criminales, solo basta que la investigación administrativa refleje que el querellado incurrió en una conducta tipificada, como delito grave o menos grave que implique depravación moral.** Íd. (Énfasis nuestro).

La sanción por la comisión de esta falta es la expulsión. Íd. Por último, la Falta Núm. 32 consiste en "[i]ncurrir en actos constitutivos de la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, 'Ley de Violencia Doméstica'. **La investigación administrativa no dependerá de los resultados del caso criminal**". Íd. (Énfasis nuestro). La comisión de esta falta acarrea la expulsión. Íd.

Entretanto, la *Ley de la CIPA*, Ley Núm. 32 de 1972, según enmendada, 1 LPRA secs. 171 *et seq.* (Ley Núm. 32-1972), creó la CIPA para atender los casos de abuso de autoridad por ciertos funcionarios públicos y para servir como organismo apelativo en algunos casos. De acuerdo con los Arts. 2 y 3 de la Ley Núm. 32-1972, *supra* sec. 172 y 173, la CIPA es el organismo con jurisdicción exclusiva para actuar como cuerpo apelativo en aquellos casos en que el Superintendente de la Policía haya impuesto cualquier medida o sanción disciplinaria a un miembro de la Uniformada por la comisión de faltas graves.

Ahora bien, el Art. 3 de la Ley Núm. 32-1972, *supra*, establece el procedimiento administrativo que la CIPA llevará a cabo para cumplir su propósito como órgano apelativo. A esos efectos, es categórico en que las reglas de evidencia que prevalecen en los

tribunales <u>no serán obligatorias</u> en ningún procedimiento efectuado ante la CIPA. Íd.

Por último, resulta preciso señalar que el Art. 6 de la Ley Núm. 32-1972, *supra* sec. 176, le provee a la CIPA una poderosa herramienta para compeler la asistencia de testigos o la producción de evidencia, puesto que, en virtud de dicha disposición, el Presidente de la CIPA <u>puede</u> solicitar ayuda a la Sala de San Juan del TPI para requerir la asistencia y declaración de un testigo, cuando este no comparezca, o la producción de evidencia, cuando este se rehusara a proveerla.

**D.**

La Ley Núm. 54-1989, *supra,* fue promulgada para establecer medidas dirigidas a prevenir y combatir la violencia doméstica en Puerto Rico, tipificar delitos relacionados con esta conducta y crear un andamiaje de órdenes de protección para las víctimas de violencia doméstica. El Art. 3.1 de la Ley Núm. 54-1989, *supra* sec. 631, se tipifica el delito de Maltrato de la siguiente manera:

> Toda persona que empleare fuerza física o violencia psicológica o económica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación, para causarle daño físico a su persona, al animal de compañía o mascota de la víctima, de los hijos o del victimario, a los bienes apreciados por esta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional, incurrirá en delito grave de cuarto grado en su mitad superior. No será necesaria la prueba de un patrón de conducta para que se constituya el delito de maltrato. El tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida. La violencia psicológica también ocurrirá cuando se utilice cualquier tipo de comunicación electrónica o digital, mediante mensajes de texto, correo de voz, correos electrónicos, o redes sociales, o cualquier otro medio digital, incluyendo sistemas de rastreo satelital, que tenga el efecto de acosar, perseguir, intimidar, o afligir a una persona con quien se sostiene o se haya sostenido una relación de pareja, o la persona con quien cohabita o haya cohabitado. Para que se constituya la violencia psicológica mediante violencia digital o cibernética, no será necesario la prueba de un patrón de conducta.

Entretanto, el Art. 2.8 de la Ley Núm. 54-1989, *supra* sec. 628, dispone sobre el delito de Incumplimiento de órdenes de protección lo siguiente:

> Cualquier violación a sabiendas de una orden de protección expedida, de conformidad con esta Ley, será castigada como delito grave de tercer grado en su mitad inferior, disponiéndose que los tribunales vendrán obligados a imponer supervisión electrónica, de concederse cualquier tipo de sentencia suspendida.

**IV.**

En el presente caso nos corresponde resolver si procede ratificar la expulsión de un ex agente de la Policía de Puerto Rico por la comisión de presuntas faltas graves, en violación del Reglamento Núm. 4216, *supra,* cuando el alegado infractor fue encontrado no culpable en un procedimiento criminal iniciado en su contra por los mismos hechos que dieron pie a la acción administrativa y si, a la luz de la prueba desfilada, el foro recurrido resolvió correctamente que no se presentó prueba suficiente para justificar la medida disciplinaria en su contra. De igual manera, amerita atender si el foro recurrido debió admitir cierta evidencia de imágenes de mensajes de texto amenazantes e insultantes que se alega envió el agente y si estos son materiales al asunto de la expulsión.

A juicio de la CIPA, no se presentó suficiente prueba para justificar la expulsión del señor Maldonado Rosado. Fundamentó su determinación en que el recurrido fue encontrado no culpable por el TPI por el delito de Maltrato bajo el Art. 3.1 de la Ley Núm. 54-1989, *supra*, y que la señora Benítez Almodóvar no compareció a la vista administrativa en su fondo. Asimismo, estimó que las fotos de la señora Benítez Almodóvar, tomadas el día de los hechos, no demostraban golpes en el rostro, en la cabeza, ni en el cuello, sino solamente un leve raspón en el hombro, uno en el nudillo y otro en el antebrazo. También, concluyó que las fotografías no eran consistentes con las lesiones marcadas en el *Informe de intervención sobre violencia doméstica* preparado por la Policía sobre el incidente.

En desacuerdo, el NPPR argumenta que la evidencia documental y testifical desfilada fue suficiente para demostrar la comisión de faltas graves por el señor Maldonado Rosado. Para impugnar la determinación de la CIPA, la parte recurrente arguye que el foro recurrido: (1) le otorgó importancia excesiva a la declaración de no culpabilidad del recurrido en el procedimiento penal, el cual es independiente al proceso disciplinario por las faltas graves imputadas en este caso y no debe sostenerse al mismo grado de prueba; (2) le otorgó un peso excesivo a que la señora Benítez Almodóvar no presentó su testimonio; (3) concluyó erróneamente que no contaba con la versión de los hechos de la señora Benítez Almodóvar, puesto que contaba con evidencia respecto a esta; (4) debió admitir en evidencia las fotos de los mensajes de texto presuntamente recibidos por la señora Benítez Almodóvar. Asimismo, plantea que el recurrido reconoció la agresión al testificar que él también fue agredido.

En apoyo de la *Resolución* recurrida, el señor Maldonado Rosado argumenta que la CIPA resolvió correctamente porque la evidencia presentada por el NPPR provino de maquinaciones y fabricaciones en contra del recurrido, lo cual no sustentó con prueba alguna. Igualmente, arguye que la incomparecencia de la señora Benítez Almodóvar amerita que se presuma que lo que declararía no era correcto. Aún más, esboza que se demostró que el señor Maldonado Rosado fue el agredido y no el agresor, según comprueba que fue declarado no culpable por el TPI.

Tras un análisis objetivo, sereno y cuidadoso del expediente del caso, de la prueba documental presentada y de la TPO desfilada y estipulada por las partes, en correcta práctica adjudicativa apelativa, resolvemos que la CIPA erró al revocar la expulsión del señor Maldonado Rosado y ordenar la compensación de los salarios dejados de percibir desde que fue separado del cargo. En el

expediente administrativo obra suficiente evidencia para determinar hechos distintos al foro recurrido, derrotando la presunción de regularidad y corrección que rodea el dictamen. En ese respecto, la evidencia documental y testifical desfilada ante la CIPA constituyó prueba sustancial de que el señor Maldonado Rosado incurrió en las Faltas Administrativas Núm. 31 y 32 al agredir repetidamente a la señora Benítez Almodóvar en diferentes partes de su cuerpo. La consecuencia de estas infracciones es la expulsión. Incluso, según admitió el propio recurrido, él agredió a la señora Benítez Almodóvar, toda vez que reconoció que <u>también</u> fue agredido.[70]

Más aún, el foro recurrido erró en su aplicación del derecho, puesto que ignoró las disposiciones de la jurisprudencia y el Reglamento Núm. 4216, *supra*, las cuales establecen que la acción administrativa, especialmente la de este caso, es independiente del procedimiento penal y no requiere el mismo grado de prueba. Por un lado, nuestro más alto foro ha reiterado que, de lo contrario, se atarían las manos de la autoridad nominadora y se le privaría de su prerrogativa legal de destituir y disciplinar. ***San Vicente v. Policía de PR,*** supra. Por el otro, en específico, las Faltas Administrativas Núm. 31 y 32 dispuestas en la sección 14.6.1 del Reglamento Núm. 4216, *supra*, incluyen lenguaje respecto a que para demostrar que se incurrió en ellas no es necesaria la radicación, el progreso o resultado de cargos y casos criminales, <u>siendo suficiente que la investigación administrativa refleje que se incurrió en la conducta tipificada</u>. De esta forma, resulta palmario que la determinación de no culpabilidad del señor Maldonado Rosado no impide que se determine que este incurrió en las faltas imputadas.

De igual manera, la CIPA erró al determinar que no contaba con la versión de los hechos de la señora Benítez Almodóvar, puesto

---

[70] TPO, pág. 62, línea 11.

que la agente Negrón Fuentes narró el relato contemporáneo de esta. Al igual, el agente Almodóvar Santiago declaró sobre la versión de la señora Benítez Almodóvar sobre quién le causó los golpes, los cuales el agente observó y documentó mediante fotografías según ella los localizó en su presencia. Requerir que la víctima declare en la acción disciplinaria administrativa de manera indispensable no es cónsono con la jurisprudencia, ni con la Ley Núm. 32-1972, *supra.* Y es que el estatuto habilitador de la CIPA prescribe que las Reglas de Evidencia, *supra,* no serán obligatorias en ninguno de sus procedimientos. Por consiguiente, el foro recurrido no tenía que descartar la versión de la agredida, la cual contaba con visos de confiabilidad, toda vez que fue presentada ante el TPI para la obtención de la *Orden de protección OPA-2018-017969,* reseñada en las determinaciones de hechos por la jueza que la expidió y sirvió de base para la expedición de esa orden.[71] Además, fue relatada *in extenso* y en detalle por la agente Negrón Fuentes ante la CIPA, quien también la incluyó en el *Informe de intervención sobre violencia doméstica*[72]*,* preparado el mismo día de los hechos. También, fue recibida por el agente Almodóvar Santiago en su interacción con la señora Benítez Almodóvar.

Igualmente, sostener la indispensabilidad de la declaración de la persona agredida o víctima resultaría en la imposibilidad de que la autoridad nominadora ejerza su facultad disciplinaria. En casos de agentes del orden público, aún más, toda vez que las presuntas víctimas se enfrentan a personas que ostentan la autoridad policial del Estado y reciben cierto reconocimiento público por su servicio. Bastaría con que la víctima no se presente, por cualquier razón, para que el NPPR no pueda disciplinar a sus agentes.

---

[71] Apéndice del *Recurso de revisión administrativa,* Anejo XXVI, pág. 69.
[72] Íd., Anejo XXV, pág. 66.

Ahora bien, la evidencia que se desfiló ante la CIPA era suficiente para demostrar que la expulsión del señor Maldonado Rosado estuvo bien fundada. En las fotografías admitidas como Exhibit Núm. 5 del NPPR se pueden observar golpes en el cuello, el hombro, el brazo y los nudillos de la señora Benítez Almodóvar;[73] en su mano derecha;[74] y en su cabeza[75]. Estas lesiones son consistentes con lo descrito en el *Informe de intervención sobre violencia doméstica* y la versión de los hechos de la señora Benítez Almodóvar, narrada por la agente Negrón Fuentes. También, son consistentes con las declaraciones que hizo la agredida al agente Almodóvar Santiago el día de los hechos como parte de la investigación. Ambos agentes, además, percibieron las lesiones que tenía la señora Benítez Almodóvar en su cuerpo y declararon sobre ello ante el foro recurrido.

Todavía más, el expediente cuenta con la admisión del propio señor Maldonado Rosado de que agredió a la señora Benítez Almodóvar. En la vista administrativa en su fondo, el recurrido declaró que, el 16 de junio de 2018, le manifestó a la agente Negrón Fuentes que "[...] a mí ella me agredió también, tú no me preguntaste, me vienes a preguntar ahora".[76] Igualmente, pese a decir que fue agredido y que se le fabricó prueba en su contra no presentó querella alguna, ni prueba respecto a su alegación.

No existiendo óbice para determinar que el señor Maldonado Rosado incurrió en las faltas graves imputadas por el NPPR, correspondía su expulsión de la Uniformada. Esa determinación se sostiene por la evidencia sustancial que obra en el expediente administrativo. La conducta del señor Maldonado Rosado – por la que fue acusado penalmente e imputado administrativamente – es

---

[73] Apéndice del *Recurso de revisión administrativa*, Anejo XXVII, pág. 74 y 75.
[74] Íd., pág. 76.
[75] Íd., pág. 77.
[76] TPO, pág. 62, líneas 11-12. (Énfasis nuestro).

constitutiva de infracciones a la Ley Núm. 54-1989, *supra*, consistentes en Maltrato e Incumplimiento de órdenes de protección. Así lo determinó el NPPR luego de una investigación preliminar y lo validó la prueba desfilada ante la CIPA. Ello, independientemente del progreso o del resultado de cargos criminales.

Por último, la CIPA pudo admitir las capturas de imágenes presentadas por el NPPR de los mensajes de texto enviados a la señora Benítez Almodóvar, presuntamente por el señor Maldonado Rosado. Estas tienden a ofrecer prueba adicional de la conducta del recurrido. Otro es el asunto del peso probatorio que el foro recurrido le podría dar a dichas imágenes, el cual aventuramos sería poco o ninguno. Sin embargo, diferimos de ese curso de acción. Como se mencionó, las Reglas de Evidencia, *supra*, no son de aplicación al procedimiento ante la CIPA y, por ello, las imágenes debían ser admitidas. Además, cabe resaltar que cualquier alegación del señor Maldonado Rosado sobre la fabricación de los mensajes quedó en meras alegaciones, puesto que no presentó evidencia alguna sobre la presunta maquinación a la que hizo referencia.

Ahora, al considerar la totalidad de los testimonios, resulta meritorio darles peso a las imágenes, toda vez que fueron consideradas por el TPI para la emisión de una orden de protección y una determinación de peligrosidad al respecto. Así lo relató la agente Negrón Fuentes.[77] Así lo consignó el TPI en las determinaciones de hechos de la *Orden de protección OPA-2018017969.*[78] Así lo testificó el agente Ruiz Cordero, quien expresó que la jueza que expidió la orden habló y le preguntó a la señora Benítez Almodóvar sobre los mensajes de texto.[79] En ellos, se aprecia

---

[77] TPO, pág. 17, líneas 18-21, pág. 18, líneas 21-23 y pág. 19, líneas 1-3.
[78] Apéndice del *Recurso de revisión administrativa*, Anejo XXIV, pág. 61.
[79] TPO, pág. 20, líneas 1-5.

una multiplicidad de insultos y amenazas dirigidas a la señora Benítez Almodóvar. No obstante, cabe reseñar que independientemente de la consideración de estas imágenes, los hechos constitutivos de las faltas graves quedaron probados mediante otra prueba suficiente.

Además, resulta preciso recordar que, por disposición legal, la CIPA tenía la facultad de solicitar ayuda al TPI para requerir la comparecencia de la señora Benítez Almodóvar, de entender que su testimonio era imprescindible, o la producción de evidencia sobre la procedencia de los mensajes de texto recibidos por esta, de estimar que no fue corroborada. Art. 6 de la Ley Núm. 32-1972, *supra.*

Por todo lo anterior, corresponde revocar la *Resolución* recurrida y confirmar la determinación del NPPR de expulsar al señor Maldonado Rosado.

**V.**

Por los fundamentos pormenorizados, se *revoca* la *Resolución* recurrida emitida por la CIPA y se *confirma* la expulsión del señor Maldonado Rosado del Negociado de la Policía de Puerto Rico.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones